[1] Reported in 8 N.W.2d 222, 10 N.W.2d 481.
This is an appeal by the heirs of Estella Simmons, deceased, from an order denying their motion for a new trial. The propriety of the allowance of the administrator's compensation and attorneys' *Page 390 
fees is involved. The probate court approved the second intermediate account of the administrators of the estate allowing Lawrence Jayne $60,000 for his services as administrator and the firm of Johnson, Sands Brumfield $25,000 as attorneys for the administrators. The heirs appealed from this order to the district court, which made findings that the allowances were reasonable and proper. The heirs' motion for a new trial challenged only that part of the findings and conclusions dealing with the reasonableness of these allowances.
Estella Simmons died intestate on February 11, 1939, leaving four heirs at law, who are the appellants here. The estate consisted mostly of negotiable bonds and cash in the amount of approximately $500,000 and some promissory notes of little value. These securities and some cash had been in two safety deposit boxes in St. Paul. One box was in Miss Simmons' name and that of Addie Stephan, a niece, and Charles Powell, a cousin. The other, rented in January 1939, was in the name of Charles Powell and a Miss Essie Williams, who had been consulted by Miss Simmons as an attorney. Three days before Miss Simmons' death and again on the date of her death, Charles Powell and Miss Williams removed from the safety deposit boxes of the deceased a large number of negotiable bonds and a large amount of currency. Miss Williams took $30,000 in cash and bonds, and Powell took the rest to his home. It was claimed that in one of the boxes there was found a list of 32 donees with amounts of the donations which were to be made to each set opposite each name, that these donations aggregated $137,000, and that there was at the end of the list a statement that the balance was to be divided five ways between three of the heirs, Stephen Finnigan, a grandnephew of the deceased, and Charles Powell. The original of this alleged list was asserted to have been destroyed at the direction of Essie Williams, and only an alleged copy made by Powell appears. There is no contention that Miss Simmons signed the alleged original list or that the list was in her handwriting. Powell then made up "gift packages," as he claims, in accordance with the list *Page 391 
and mailed some of them. Some of the "donees" were not residents of this state. He then delivered some cash and bonds to Essie Williams for division according to the "list." On February 13, 1939, the day of the funeral, Miss Williams delivered $5,000 each to Dean White, son of one of the appellants, and Stephen Finnigan; and to Addie Stephan, one of the appellants, $8,200 for herself and $140,000, which later the same day Mrs. Stephan divided, somewhat unequally, between herself, the other three heirs, and Stephen Finnigan. Three of the heirs and Finnigan then returned to Freeport, Illinois. Some of the bonds they took with them were registered, so on February 15 they consulted Lawrence Jayne, an attorney of that city (who is now administrator of the estate), as to how they might have them transferred.
Mr. Jayne immediately advised these people that all of the estate was subject to inheritance taxes and that jurisdiction of the estate was in the state of Minnesota. He was then employed to clear title to the property and to discover the assets of the estate. Jayne immediately came to St. Paul and commenced his investigation. All four of the heirs, on Jayne's advice, turned over to him for the estate the securities they, and in some cases their children, had received. February 22, Jayne and Mrs. Stephan went to the office where Powell was employed and questioned him but got no information. He told them to see Miss Williams. Finally, Jayne advised Powell to get a good lawyer, and Powell engaged Mr. William Oppenheimer of the St. Paul bar, who advised him to disclose everything to Jayne. Cash and bonds aggregating some $181,000 which Powell had taken from the deposit boxes before Miss Simmons' death were then placed in a bank subject only to withdrawal by Powell or Mr. Oppenheimer. Through Mr. Oppenheimer, Powell filed written objections in the probate court to the appointment of an administrator by the heirs. It was his claim that the assets were in his possession under a gift causa mortis. At first he denied that Miss Williams had taken any money, but later admitted that she had taken $30,000 and that he had counted it. *Page 392 
Jayne returned to Freeport on the following Saturday, February 25, 1939. On Tuesday, February 28, he returned to St. Paul, spending about 12 days in the city discussing a settlement with Powell through his attorney and engaging in a search for more assets of the estate. Upon his return to Freeport, he inventoried the securities which the heirs had placed in their deposit boxes there. These securities aggregated $139,000. Together with the securities placed in the bank by Powell, they aggregated some $320,000. He again returned to St. Paul on April 1 and remained for 15 days, the first four of which were spent in concluding the negotiation with the four heirs, Mr. Powell, and Stephen Finnigan. By the terms of this agreement, Powell retained the $16,212.58 deposited in joint accounts with Miss Simmons in two St. Paul banks, of which he was owner by right of survivorship. Powell was also given $5,000 in cash and two tracts of real estate, deeds to which from Miss Simmons to him were found in the safety deposit boxes. There is some evidence tending to show that the real estate was considered to be worth $12,000 or $13,000. These deeds not having been delivered during Miss Simmons' lifetime, quitclaim deeds from the heirs to Mr. Powell were executed and delivered. In addition to the foregoing, Mr. Powell's son and daughter each received $5,000 and his mother $1,000, all of the Powells foregoing their claims to any of Miss Simmons' property under the theory of a gift causa mortis. They also were to pay the inheritance or gift taxes due to the state on account of the money or property so received by them. All other property which Powell had taken from the Simmons estate was to be returned to the estate, and he represented that it was so returned.
It was also agreed that Stephen Finnigan, who was a son of a deceased sister of three of the heirs (one of the heirs was a half sister of the other heirs), but who, as the law then stood in Minnesota, was not an heir of Miss Simmons, would accept $25,000 in full discharge of any claim that he might have on the theory of a gift causa mortis or otherwise to the property left by Miss Simmons. Finnigan also agreed to act as coadministrator without *Page 393 
compensation, but his connection with the estate was purely formal, as Jayne did all the work. Mutual releases were contained in the contract which disposed of all claims of giftscausa mortis insofar as parties to the contract were concerned. Jayne was then appointed one of the administrators of the Simmons estate.
The estate was inventoried, Jayne tracing the assets back through the Webb estate, from which much of the Simmons estate came. The furniture at Miss Simmons' residence was inventoried and searched, and some cash was there found. Also, some coupons from bonds which were not found indicated that there were possibly $76,000 par of bonds which had either been disposed of by Miss Simmons or not discovered in the safety deposit boxes or turned into the estate.
Immediately after Jayne was appointed administrator, he attempted to have Essie Williams cited into probate court on the matter of the $30,000 in bonds and cash which he had discovered during the negotiations that she had taken from the safety deposit box. Before the return day of the citation, Miss Williams brought suit in the district court for a declaratory judgment, asserting that she possessed the $30,000 as a trust fund to pay gift and inheritance taxes on the property distributed, as she claims, according to Miss Simmons' wishes. Jayne engaged the firm of Johnson, Sands Brumfield as counsel. He had consulted Mr. Sands of that firm in connection with his rights as to the property which Powell had possessed himself of and also with reference to the proposed settlement with Powell. This firm conducted the Williams litigation, although Jayne himself took an active part therein. A demurrer was interposed, argued, and overruled. An answer was then interposed, the $30,000 impounded in a safety deposit box, and the case, which occupied two days, was tried in the district court. Considerable time was spent in preparation for trial and later in drafting findings at the court's request. Then plaintiff's motion for amended findings or a new trial was successfully opposed. The case was appealed by plaintiff to this court and argued here. The result was an affirmance of the trial court's decision, *Page 394 
which was that there was no trust and that Miss Williams was not entitled to the $30,000 or any part thereof. Williams v. Jayne, 210 Minn. 594, 299 N.W. 853. This court is familiar with that phase of the litigation, which ultimately resulted in a recovery of $33,400 for the estate. Mr. Sands testified that this litigation occupied 60 days of his time. His services in both the trial court and here achieved the best possible result.
Jayne also brought suit against the Heger Products Company, in which Miss Simmons had been a stockholder, and on account of irregularities in the operation of that company he succeeded in making a settlement by which he recovered $1,850. Two suits were brought in Illinois by which he recovered $1,500 and $2,000 respectively. A third was still pending against Phoebe Brockway at the time of trial. There are still some 15 or 16 suits either brought or ready to be brought to recover items of $1,000 to $5,000 which had been sent to some of the persons whose names appeared upon the alleged list of donees.
There are also various problems that have engaged Jayne's time and attention involving the state and federal inheritance taxes, money and credits tax, and some controversy over a gift tax on the items distributed to donees on the list. There is a matter of rebate to be sought from the internal revenue department when the amounts finally recovered in the various lawsuits are turned into the estate.
Miss Simmons also had a note of Watson P. Davidson which was appraised at $16,000. On this note Jayne has collected $4,000 but has been unable to collect the remainder.
Then there was an abortive suit in the federal district court, which Jayne induced Johnson, Sands Brumfield to commence on behalf of Gertrude Fife against himself as administrator and some of the persons who had received so-called "gift packages." This was in the ill-founded hope of adjudicating the rights of all the "gift package" recipients in one suit. There were 15 defendants, and two causes of action were attempted to be stated. Most of the recipients appeared by counsel and succeeded ultimately in *Page 395 
getting the suit disposed of for lack of jurisdiction. Mr. Sands testified that he spent 30 days on this case. It is irregular to award fees from an estate for suits brought against the administrator, but since it was hoped that the purpose would be beneficial to the estate and the administrator's interest was hostile to the defendant "gift package" recipients, we give him the benefit of considering that the services would be beneficial to the estate.
Jayne has also brought suit against Essie Williams to recover a penalty for interference with the estate of a deceased person under Minn. St. 1941, § 525.392 (Mason St. 1940 Supp. § 8992-96). She has countered with a claim that, on account of Powell's failure to act as trustee, she was trustee of the entire Simmons estate, which she alleged was worth $600,000. This suit is still pending.
Partial distribution to the heirs was ordered, and from the shares distributed there was deducted the amount which had been delivered to the children of the heirs. Settlements were made with the Rev. Dr. H. N. Wilson, who had received $5,000, also with the Central Presbyterian Church, which had received $3,000, and the Oakland Cemetery, which had received $1,000. This left 15 claims, ranging from $1,000 to $5,000 and aggregating $36,000, outstanding in the hands of recipients of the "gift packages" at the time the account was filed.
It is for the foregoing services to the estate and for those which he and his attorneys may be called upon to perform in the future that Jayne asked for compensation in the sum of $60,000 for himself and $25,000 for his attorneys.
1. Insofar as the administrator's compensation is concerned here, the impression seemed to prevail below that Jayne, in effect, created the estate and that it required unusual ability as a lawyer and as an administrator to effect the recovery of the estate's assets; whereas, as a matter of fact, he had no difficulty whatever in convincing his own clients, and in fact all four of Miss Simmons' heirs, that they should turn in to the estate the very substantial amounts of securities and cash which they had already received when his services were engaged. It was to their interest *Page 396 
to do so. By two days of negotiation with Powell and his lawyer, the large amount of securities which were in Powell's possession were safely deposited where they could come to no harm pending the negotiations which culminated on April 4, 1939, in a contract by which the bulk of the estate came into the possession of the administrators, thus eliminating the claims of gifts causa mortis insofar as the heirs and their children and Powell and his family were concerned. There followed the litigation with Essie Williams, which did not involve the entire estate even by implication. It was not a case presenting peculiar difficulties in the trial. It went off on a question of fact below and was affirmed here on the grounds that there was sufficient evidence to support the findings below.
Jayne had been diligent in recovering other assets of the estate, such as locating the bonds partly paid for at Wells-Dickey Company and the $11,000 worth of coupons at Miss Simmons' residence. His achievements for the estate from February 22, 1939, to April 15 of that year reflect credit upon his diligence and alertness. But after the settlement with Powell and Finnigan in behalf of the heirs was made and, with the consent of the heirs, the money paid their children had been charged against the shares distributed, the bulk of Jayne's accomplishments, except the recovery from Miss Williams, had been achieved. From that time on his services have largely been routine tax matters and adjustments of comparatively minor matters.
Not much credit can be given to him for exceptional astuteness in conceiving the ill-advised and ill-starred litigation in federal court. Nor has he shown much diligence in his endeavor to recover the outstanding claims on the gift packages which were distributed before he first came to St. Paul. According to his testimony, there is still some $36,000 unrecovered, of which about $26,000 is in the hands of persons in this jurisdiction. More than 18 months had elapsed between his appointment on April 5, 1939, as administrator and the filing of the account here under consideration, yet most of these suits had not been commenced at the *Page 397 
time of the trial. It is the duty of an administrator to proceed promptly with the collections of claims due the estate. In re Estate of Marchildon, 188 Minn. 38, 246 N.W. 676.
2. Jayne kept no account of the time spent on this estate. He says that altogether he spent 169 days in St. Paul. As to the time spent on the estate in his office in Freeport, Illinois, he relies on estimates of a percentage of the whole time spent in the office, saying that 40 to 50 percent of his time went into work on the estate. Such an estimate is too vague and unsatisfactory to be convincing. We disapprove of this unbusinesslike way of keeping an account against an estate. When an administrator comes into court with an account as to his charges, he should be able to present a bill of particulars specifying time and dates and character of services rendered.
3-4. While the allowance of an administrator's compensation and that of his attorneys rests largely in the sound discretion of the courts to which such claims are presented, "it is discretionary only in the sense that there are no fixed rules to determine the proper allowance, and is not discretionary in the sense that courts are at liberty to give anything more than a fair and reasonable compensation." Watkins v. Bigelow,96 Minn. 53, 55, 104 N.W. 683, 684. We do not, of course, try the case de novo, but where there is no controversy as to the facts, or where we consider the facts in the light most favorable to the claimant, the general rule as to review of a trial court's findings does not apply in its full force to allowances of an administrator's compensation or that of his attorneys. Estates in probate are under the protection of the law, and it is the duty of courts to protect them from dissipation by exorbitant allowances to their officers.
5. The impression seemed to prevail below that the heirs were fortunate in not falling into the hands of rascals and that the administrator was entitled to exceptional compensation because he was honest and diligent. Those interested in the estate were entitled to a full measure of honesty, diligence, and zeal as a matter of course when they engaged a lawyer, and they were equally entitled *Page 398 
to it when he became administrator. That was what he was hired and appointed for.
6. On this appeal, appellants do not challenge the administrator's right to compensation from the estate for work done by him as attorney for some of the heirs before he became administrator. There is no objection to such an allowance if the work was done for the benefit of the estate. King v. Grace,293 Mass. 244, 200 N.E. 346.
7. In determining the reasonableness of these allowances, the trial court considered not only services which the administrator and his attorneys have rendered but also future services that will have to be rendered before the estate can be closed. This was improper. It appears from this record that before the estate can be closed numerous lawsuits both within and outside this jurisdiction must be brought to a conclusion. Some of these are pending, and others have not been commenced. The tax question is yet to be settled. The undiscovered bonds are yet to be investigated. Whether or not litigation would be necessary to recover some of these is, of course, unknown.
Unpredictable events may prevent the administrator or the attorneys from performing future services for this estate. For example, the attorney who was most active in the previous litigation is now in the Armed Forces. No award for prospective services should be allowed, because compensation is not due until services have been rendered. 3 Woerner (3 ed.) Am. Law of Adm. p. 1830, § 533; Re Fortune Estate, 30 West. L. R. of Canada (Man.) 735; In the Will of Short, 11 Vict. L. R. (Aus.) 634; In re Hagerty's Estate, 97 Wn. 491, 166 P. 1139. See also In re Galloway, 139 Misc. 183, 248 N.Y. S. 153.
8. After careful consideration of all the evidence, we hold that the findings that Jayne's services are reasonably worth $60,000, and those of Johnson, Sands Brumfield $25,000 are not sustained by the evidence. The order appealed from is reversed and a new trial is granted unless consent is filed to a reduction of Jayne's compensation to $25,000, less what he has already received *Page 399 
as compensation, and the item for Johnson, Sands Brumfield to $15,000, less what has previously been allowed and paid them for services. This is without prejudice to an allowance for services which may be performed subsequent to the filing of the account here under consideration.
Reversed with conditions.
 ON APPEAL FROM CLERK'S TAXATION OF COSTS.
On March 30, 1943, the following order was filed:
It is ordered that the clerk's taxation of costs and disbursements in favor of appellants and against Lawrence Jayne, individually, and Messrs. Johnson, Sands Brumfield be, and it is hereby in all things, affirmed.