In the Matter of the PAMELA ANDRE-AS STISSER GRANTOR TRUST Under Second Amendment and Restatement of Trust Agreement dated June 6, 2001.

No. A10–1646.

Supreme Court of Minnesota.

Aug. 1, 2012.

Michael R. Cunningham, Sally Stolen Grossman, Norman M. Abramson, Abigail S. Crouse, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, for appellant/cross-respondent.

Charles E. Lundberg, Alan I. Silver, Steven P. Aggergaard, Bassford Remele, P.A., Minneapolis, for respondent/cross-appellant.

## OPINION

ANDERSON, PAUL H., Justice.

Vernon L.E. Stisser (Stisser), the personal representative of the estate of his late wife, Pamela Andreas Stisser (Pamela), petitioned the Hennepin County District Court for an order directing certain payments and disbursements from Pamela's inter vivos trust (Trust or Trust Agreement). Among other claims, Stisser sought an order requiring trustee David L. Andreas (Trustee) to (1) pay all debts at the time of Pamela's death that were secured by Pamela's personal property and by Pamela's and Stisser's real estate; (2) compensate Stisser for his services as the personal representative of Pamela's probate estate; and (3) reimburse Pamela's estate for all probate estate administration expenses. The court granted the Trustee's motion for partial summary judgment on Stisser's claim for payment of the secured debts. After a bench trial on Stisser's remaining claims, the court concluded that the Trust Agreement did not require the Trustee to compensate Stisser for his services as personal representative and required the Trustee to pay only a limited amount of Stisser's claimed administration expenses. A divided court of appeals affirmed in part and reversed in part. Because we conclude that the court of appeals incorrectly held that the phrase "pay ... my legal debts" requires the Trustee to pay debts secured by Pamela's personal property, we affirm the court of appeals in part, reverse in part, and remand to the district court.

*Pamela Andreas Stisser Grantor Trust*

In 1966, decedent Pamela Andreas Stisser created an inter vivos trust for her lifetime benefit. In 1983, Pamela married Vernon L.E. Stisser. It was a second marriage for both. At about the time of their wedding, Pamela and Stisser executed a joint handwritten will. In 1999, and again in 2001, Pamela amended and restated the Trust Agreement. These amendments provided that during Pamela's lifetime she would continue to be the Trust's sole beneficiary and, upon her death, Pamela's three children from her first marriage and Stisser's four children from his first marriage would be the Trust's remainder beneficiaries. The Trust's assets were to be divided equally among the seven children.

The Trust Agreement includes the following direction for the payment of "Expenses and Taxes" upon Pamela's death:

> 3.1 *Expenses and Taxes.* The Trustees shall, if requested by the legal representative of my estate, or in their own discretion may, pay the following expenses, debts and taxes, directly or through the legal representative of my estate by way of advancement to or reimbursement of said legal representative:
>
>> 3.1.1 *Expenses.* The expenses of my last illness, funeral, burial or other disposition, unpaid income and property taxes properly chargeable against my estate, expenses of administration of my estate, including my non-probate assets, and my legal debts.

The Trust Agreement also directs the Trustee [1] to reimburse Pamela's fiduciaries for expenses and compensate them for their services. More specifically, section 11.1 of the Trust Agreement reads as follows:

> 11.1 *Compensation.* My fiduciaries shall be entitled to reimbursement for expenses and to receive compensation for their services. Such compensation shall be based principally upon the time and labor required in order to fulfill their responsibilities hereunder, giving due regard to the complexity and novelty of any special problems or issues encountered in the administration of my estate or such trust, as well as the nature and extent of their responsibilities assumed and the results obtained in performing their duties.

*Pamela's Death and Subsequent Events*

Pamela died on November 17, 2002. At the time of Pamela's death, Pamela's and Stisser's joint will remained in effect. Under the terms of the will, Pamela's entire probate estate passed to Stisser and Stisser was nominated to serve as the estate's personal representative. As previously noted, the Trust's assets, which totaled approximately $9.1 million at the time of Pamela's death, were to be divided equally among the remainder beneficiaries— Pamela's three children and Stisser's four children.

In August 2003, Stisser demanded payment from the Trustee of all of Pamela's debts at the time of her death. In making this demand, Stisser cited section 3.1.1 of the Trust Agreement. Stisser specifically demanded payment of Pamela's credit card debts and payment of the following secured debts: (1) a $621,324 promissory note, co-signed by Pamela and Stisser, secured by residential real estate located in Galesburg, Illinois, that was owned by Pamela and Stisser as joint tenants; (2) a $1,366,205 purchase-money note and mortgage secured by a condominium located in Naples, Florida, owned by Pamela and Stisser as tenants by the entirety; (3) a $658,293 mortgage note, co-signed by Pamela and Stisser, on commercial real property located in Galesburg, Illinois, titled in Stisser's name only; and (4) a $1,716,440 margin loan secured by Pamela's Charles Schwab brokerage account, which account became an asset of Pamela's probate estate upon her death.[2] Thus, at

---

1. From the creation of the Trust until 2004, Pamela's father, Lowell Andreas, served as trustee. Pamela's brother, David L. Andreas, was appointed cotrustee with their father Lowell in 2003, and became sole trustee upon Lowell's resignation in March 2004. For simplicity and clarity, we will refer to David as the "Trustee."

2. When Pamela died in November 2002, her Schwab brokerage account had a value of approximately $3,030,856. In April 2008, account ownership passed to Stisser under the terms of Pamela's and Stisser's joint will. At that time, Stisser transferred all of the assets in Pamela's Schwab account to a similar brokerage account with Raymond James. Stisser's Raymond James account also secured a

the time of Pamela's death, the total outstanding debt secured by Pamela's probate and non-probate assets was $4,362,262.

The Trustee disagreed with Stisser's assertion that Trust Agreement section 3.1.1 required the Trustee to pay off Pamela's debts with Trust assets. Nevertheless, the Trustee attempted to compromise with Stisser regarding his claims. The Trustee testified at trial that in an effort to avoid litigation, he made several multi-million dollar settlement offers to Stisser. Initially, the Trustee offered to pay all of the debts demanded by Stisser if Stisser would agree that, upon his death, all of the real estate that was jointly-owned by Pamela and Stisser at the time of Pamela's death would go to the Trust's beneficiaries— Pamela's three children and Stisser's four children. Later, the Trustee offered to pay—without restriction—all of Pamela's unsecured debt and half of the debt on the jointly-owned Naples and Galesburg residential properties. This second offer from the Trustee was estimated by the Trustee to total over $2.1 million.

The Trustee's overtures, in the form of letters mailed to Stisser on October 21, 2003; October 31, 2003; November 5, 2003; January 7, 2004; and January 28, 2004, went unanswered. Stisser testified that he did not respond to the Trustee's settlement offers or make counterproposals because he found the offers unacceptable and he was "sticking to [his] guns." The failure of the parties to settle Stisser's demand for payment resulted in over 7 years of litigation in three states—Florida, Illinois, and Minnesota.

*Florida and Illinois Litigation*

In January 2003, 2 months after Pamela's death, the loan secured by Pamela's and Stisser's Galesburg residence became due. Central Illinois Bank (CIB), the mortgagee and holder of the note, demanded immediate payment of the indebtedness in full. Stisser elected not to pay the loan, causing CIB to initiate mortgage foreclosure proceedings in Illinois state court. According to James Potter, Stisser's Illinois counsel, Stisser then used personal assets to fund a shell corporation, MJP Farms, which, in turn, paid off the CIB loan and took an assignment of the mortgage. MJP Farms then filed a claim with Pamela's estate in Florida Probate Court, where Pamela's estate is still in probate.

The Hennepin County District Court found that the purpose of the MJP Farms probate claim was to gain a legal judgment against Pamela's probate estate, and the judgment in turn was intended to force the Trustee to pay off the debt secured by the mortgage on the Galesburg residence. In essence, the court found that the MJP Farms claim and litigation was part of a scheme by Stisser to have the Trustee pay off the mortgage note under the terms of Trust Agreement section 3.1.1. Potter further testified at trial in this case that MJP Farms made a conscious decision not to sue Stisser individually as part of an effort to enhance MJP Farms's position against Pamela's probate estate. In other words, even though Stisser was individually liable for the debt secured by the mortgage on the Galesburg residence, MJP Farms filed a claim only against Pamela's

margin loan. Shortly after that transfer, Stisser's brokerage account had a gross value of over $6.6 million and a margin loan balance under $2 million. Due to the economic downturn in 2008, the value of the Stisser's account declined sharply, forcing Raymond James to call the margin loan and sell account assets to pay off the margin loan. The value of Stisser's account in October 2008 was approximately $50,000. For simplicity and clarity, we will refer to Pamela's brokerage account as the "Schwab account."

probate estate instead of also suing Stisser individually.

In June 2004, while the MJP Farms litigation was still pending, Stisser filed a complaint in the Florida Probate Court seeking a determination of the Trust's obligation to pay certain expenses of Pamela's estate. Stisser's complaint was ultimately dismissed by the Florida District Court of Appeal, which concluded that the Florida Probate Court lacked personal jurisdiction over the Trustee. *In re Estate of Stisser,* 932 So.2d 400, 402 (Fla.Dist.Ct.App.2006). The Florida appellate court specifically held that,

> Given the fact that the law requires the probate court to have personal jurisdiction over the [Trustee] of a trust in order to enter a ruling affecting the corpus of the trust and given the fact that the [probate] court lacked such jurisdiction over the [Trustee], [that] court was without authority to rule on the complaint filed by Stisser.

*Id.*

### Estate Tax Litigation

In December 2006, the Trustee filed a petition in Hennepin County District Court under Minn.Stat. § 501B.16 (2010), asking the court to determine ownership of a $1.6 million federal estate tax refund from the Internal Revenue Service (IRS). The Trustee filed the petition because the Trust, not Pamela's probate estate, paid Pamela's estate taxes. The Trustee's petition was served on Stisser and Stisser's attorneys on January 17, 2007. On February 7, 2007, notwithstanding the Trustee's pending Minnesota petition, Stisser filed a petition in the Florida Probate Court seeking instructions for allocation of the same $1.6 million IRS estate tax refund. Then, on February 12, 2007, Stisser filed a motion to dismiss the Trustee's Hennepin County petition, claiming that Stisser's Florida petition mooted the Trustee's Minnesota petition. Stisser's motion to

dismiss failed to disclose the Florida District Court of Appeals' earlier determination that the Florida Probate Court lacked personal jurisdiction over the Trustee.

The Hennepin County District Court denied Stisser's motion to dismiss and concluded that the $1.6 million estate tax refund belonged to the Trust. Stisser did not appeal this decision. Nonetheless, in November 2007, Stisser amended his Florida petition, requesting instructions to allow him to spend the refund. Stisser's amended petition failed to disclose the final order of the Hennepin County District Court, which concluded that the estate tax refund belonged to the Trust.

### Present Litigation

In January 2008, Stisser, in his capacity as the personal representative of Pamela's probate estate, filed in Hennepin County District Court a "Petition for Accounting of Trust, Instructions to the Trustee, Instructions to Certain Beneficiaries, For Removal of the Trustee, For Transfer of the Trust, and For Appointment of a Successor Trustee." Stisser's petition, which was filed under Minn.Stat. § 501B.16, contained 18 claims, requesting relief such as an order requiring the Trustee to provide an accounting of the Trust, an order removing the Trustee, and an order transferring the situs of the Trust from Minnesota to Florida. In addition, Stisser requested an order requiring the Trustee to compensate Stisser for his services as the personal representative of Pamela's probate estate and an order requiring the Trustee to reimburse Pamela's probate estate for all administration and litigation expenses. In a subsequent petition, Stisser requested an order requiring the Trustee to pay all of Pamela's secured and unsecured debts at the time of her death.

In November 2008, the Hennepin County District Court granted the Trustee's motion to dismiss 11 of the 18 claims in

Stisser's original petition. The court found that Stisser lacked standing to bring those 11 claims. Stisser did not appeal the court's decision. In July 2009, on cross-motions for summary judgment, the court denied Stisser's motion for summary judgment and granted partial summary judgment to the Trustee. The court concluded that the Trust Agreement did not obligate the Trustee to pay Pamela's secured debts—either the mortgage notes or the Schwab account margin loan.[3]

In a bench trial in November and December 2009, the Hennepin County District Court tried the remaining issues in this case, including the Trustee's claim that the Trust was entitled to a $407,818 Florida estate tax refund that was distributed to Stisser. At trial, the court heard testimony from Stisser, the Trustee, several of the lawyers who participated in the extensive litigation between the parties, and several other witnesses, including estate-planning experts retained by the parties. The court's June 14, 2010, decision contained 75 detailed findings of fact and 69 conclusions of law and instructions. In its decision, the court concluded, among other things, that (1) the Trustee is not obligated to compensate Stisser as the personal representative of Pamela's probate estate; (2) the Trustee is not obligated to reimburse Stisser for any of the probate estate's litigation expenses; (3) the Trustee is obligated to reimburse Stisser for $10,384.75 in probate estate administration expenses but not for several other claimed administration expenses; and (4) the Trustee is obligated to pay Stisser $35,582 for certain *unsecured* debts upon which Pamela or her probate estate were an obligor. The court also concluded that Stisser must return the $407,818 Florida estate tax refund to the Trust.

Stisser appealed to the Minnesota Court of Appeals and raised three arguments.

First, Stisser asserted that the district court erred by granting partial summary judgment to the Trustee on Stisser's claim for payment of secured debts. Second, Stisser argued that the district court erred by concluding that the Trustee was not required to compensate Stisser as the probate estate's personal representative. Third, Stisser contended that the district court erred by concluding that the Trustee was not required to reimburse the probate estate for the attorney fees of the estate's lead Florida attorney, Laird A. Lile.

The court of appeals affirmed in part and reversed in part. *In re Stisser Trust,* No. A10–1646, 2011 WL 2119394 (Minn. App. May 31, 2011). The court of appeals reversed the district court's order that the Trustee is not obligated to pay the Schwab account margin loan, and concluded that the Trustee must pay this debt under the "unambiguous language" of the Trust Agreement. *Id.* at *4. But, the court of appeals affirmed the district court's order that the Trustee is not required to pay the debts secured by Pamela's and Stisser's real estate. *Id.* The court of appeals next addressed the district court's order denying compensation to Stisser as the personal representative of Pamela's probate estate and denying reimbursement for Florida attorney Laird A. Lile's attorney fees. The court of appeals called the district court's decision "harsh" but concluded that the court's rulings were not an abuse of discretion because the record supported them. *Id.* at *5. One member of the court of appeals panel dissented on the issue of the Schwab account margin loan, concluding that the unambiguous language of the Trust Agreement does not require the Trustee to pay any of Pamela's secured debts. *See id.* at *6–9 (Schellhas, J., concurring in part, dissenting in part). The Trustee

---

**3.** The parties agree that the Schwab account margin loan is a "secured debt."

petitioned our court for review, Stisser filed a conditional cross-petition for review of additional issues, and we granted review of all issues decided by the court of appeals.

## I.

The first issue we address is whether the Trust Agreement requires the Trustee to pay the debts secured by Pamela's and Stisser's real estate and Pamela's Schwab account. This issue comes to us from the district court's partial grant of the Trustee's motion for summary judgment. Our standard of review for a grant of summary judgment is de novo. *Allen v. Burnet Realty, LLC*, 801 N.W.2d 153, 156 (Minn.2011). We also review de novo a district court's interpretation of a written document, which in this case is the Trust Agreement. *See Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn.2005) (holding that interpretation of an unambiguous insurance contract presents a question of law).

We have said that our purpose in construing a trust agreement is to ascertain and give effect to the grantor's intent. *In re Trust Created Under Agreement with McLaughlin*, 361 N.W.2d 43, 44 (Minn.1985); *In re Trusteeship Under Agreement with Mayo*, 259 Minn. 91, 95, 105 N.W.2d 900, 903 (1960). We have previously explained that we must consider the grantor's "dominant intention," which we must "gather[ ] from the instrument as a whole, not isolated words." *In re Trusteeship Created Under Last Will of Ordean*, 195 Minn. 120, 125, 261 N.W. 706, 708 (1935) (citation omitted) (internal quotation marks omitted). When the trust agreement is unambiguous, we will ascertain the grantor's intent from the language of the agreement, without resort to extrinsic evidence. *McLaughlin*, 361 N.W.2d at 44–45.

The parties in this case dispute the meaning of Trust Agreement section 3.1.1, which addresses payment of Pamela's "Expenses" at the time of her death. Section 3.1.1 provides, in pertinent part, that: "After [Pamela's] death ..., [t]he Trustees shall, if requested by the legal representative of [Pamela's] estate, or in their own discretion may, pay ... my legal debts." Stisser asserts that the plain language of section 3.1.1 requires the Trustee to pay the debts secured by Pamela's personal and real property. According to Stisser, these debts are "legal debts" under the ordinary meaning of that phrase. *See The American Heritage Dictionary of the English Language* 468 (5th ed.2011) (defining "debt" as "[s]omething owed, such as money, goods, or services"; "[a]n obligation or liability to pay"); *Black's Law Dictionary* 463 (9th ed.2009) (defining "legal debt" as "[a] debt recoverable in a court of law"). In essence, Stisser contends that the plain language of section 3.1.1 does not differentiate between secured and unsecured debts, and the Trustee is required to pay *all* legal debts requested by the representative of Pamela's probate estate.

Stisser presents a credible, ordinary-meaning interpretation of Trust Agreement section 3.1.1. And we agree that we generally construe words and phrases according to their common and approved usage. *See In re Trusteeship Created by Fiske*, 242 Minn. 452, 460, 65 N.W.2d 906, 910–11 (1954). But when a grantor uses "[t]echnical words which have a definite and well-understood meaning," we generally presume that the words carry that meaning. *In re Trust Under Will of Holden*, 207 Minn. 211, 216, 291 N.W. 104, 107 (1940); *cf.* Minn.Stat. § 645.08(1) (2010) ("[W]ords and phrases are construed according to ... their common and approved usage; but technical words and phrases and such others as have acquired a special meaning ... are construed according to such special meaning....").

Therefore, we must examine the language of the Trust Agreement to determine Pamela's intent and interpret the Trust Agreement's terms to see if those terms have a technical meaning.

As mentioned above, Trust Agreement section 3.1.1 requires the Trustee to pay Pamela's "legal debts" after her death. We have not previously addressed the meaning of a general directive in a trust agreement to pay "legal debts." But we have previously considered the meaning of a similar phrase in a last will and testament. Nearly one century ago, in *Larson v. Curran*, we analyzed the following will provision: "I hereby direct that all my just debts shall be paid out of my estate...." 121 Minn. 104, 106, 140 N.W. 337, 337 (1913) (internal quotation marks omitted). In *Larson*, we declined to give the phrase "all my just debts shall be paid" much significance because we treated this general debt directive as boilerplate will language. *See Black's*, *supra*, at 198 (defining "boilerplate" as "[r]eady-made or all-purpose language that will fit in a variety of documents"). More specifically, in *Larson* we concluded that a "direction to 'pay all my just debts ...' is a purely formal phrase, commonly employed and ... su-

perfluous."[4] 121 Minn. at 110, 140 N.W. at 339.

Other jurisdictions agree with our analysis and conclusions in *Larson*. The Supreme Court of Georgia recently explained that a general directive in a last will and testament to pay legal debts is a "generic phrase ... routinely included in a will and most likely reflect[s] the testat[rix]'s intent to leave the world with [her] accounts paid and to be remembered as an upright and respectable person." *Manders v. King*, 284 Ga. 338, 667 S.E.2d 59, 61 (2008) (citation omitted) (internal quotation marks omitted). Courts in California, Delaware, Iowa, and Ohio have reached similar conclusions.[5]

The foregoing case law makes it evident that a phrase such as "pay ... my legal debts" has come to have a well-understood technical meaning when used in a document like a last will and testament. Put simply, the typical common-law directive to pay debts does not authorize a testator's personal representative or executor to pay the testator's secured obligations. *Cf. Manders*, 667 S.E.2d at 60 (concluding that the typical debt-payment clause is insufficient to require "exoneration" of a

---

**4.** Although the boilerplate language of a standard debt-payment clause is now generally viewed as being superfluous, it once carried greater significance. At common law, an executor could be held liable for a testator's debts. 5B George W. Thompson, *Commentaries on the Modern Law of Real Property* § 2631, at 136 (1978 replacement ed.). And an executor had no power to sell real estate to pay those debts in the absence of express authorization. *Id.* at 137. Hence, testators commonly employed standard debt-payment clauses to empower their executor to pay their debts. In modern times, statutes have empowered executors to pay a testator's debts, even without a general directive. *See, e.g.*, Minn.Stat. § 524.3–715(27) (2010) (authorizing a personal representative to "satisfy and settle claims and distribute the estate"). Nevertheless, the general debt directive re-

mains omnipresent in modern wills and trust agreements.

**5.** *See In re Porter* 138 Cal. 618, 72 P. 173, 174 (1903) (comparing the phrase "pay all my just debts" to the "formal, meaningless terms of endearment and pious phrases printed in the formal part of blanks for making wills"); *In re Estate of Keil*, 145 A.2d 563, 564 (Del.1958) ("The provision for the payment of debts is merely the standard provision found in most wills...."); *In re Grilk's Will*, 210 Iowa 587, 231 N.W. 327, 328–29 (Iowa 1930) (concluding that a direction to "[pay] my just debts" is "so formal as to be no more than mechanical"); *In re Estate of Carrington*, 136 N.E.2d 182, 185 (Ohio Prob.Ct.1956) (describing the "ordinary 'boilerplate' reference to payment of debts, taxes and costs of administration").

mortgage on property passed outside probate).

■■■ While Stisser acknowledges our jurisprudence and that of other states with respect to the use of a debt-payment clause in a will, he argues that the common-law meaning of a debt-payment clause in a will is irrelevant when interpreting a trust. We disagree. Our reference to the common law of wills is warranted by the legal similarities between a will and a trust disposing of a grantor's assets upon death.[6] An inter vivos trust, which is created and takes effect during the grantor's lifetime, is commonly used as a substitute for a will. *See Black's, supra,* at 1651, 1738; Restatement (Third) of Prop.: Wills and Other Donative Transfers § 7.1 (2003) (describing revocable inter vivos trusts as a common form of "will substitute"). Specifically, an inter vivos trust allows a party, "upon death, to dispose of an estate in the same or similar manner as a will but without the formalities and expense of a probate proceeding." *Black's, supra,* at 1738; *see also* Restatement (Third) of Prop.: Wills and Other Donative Transfers § 7.1 (2003) ("A will substitute serves the function of a will....").

Indeed, handbooks and guides for Minnesota practitioners often treat wills and trusts interchangeably and endorse the use of identical boilerplate language in both instruments. For example, one practitioner's guide recommends use of the following language in a basic will: "My Personal Representative shall pay ... the expenses of my last illness and funeral, valid debts, [and] expenses of administering my estate...." 1 Gary D. McDowell et al., *Drafting Wills and Trust Agreements,*

at 2–2 (Minn. CLE 6th ed.2008). The same guide recommends that estate planners include following language in a basic trust agreement: "The Trustee, if requested by the Personal Representative of my estate shall or in their own discretion may ... pay: the expenses of my last illness and funeral, valid debts and expenses of administering my estate...." *Id.* at 6–7; *see also ABC's of Will and Trust Drafting,* at 4–11 (wills), 5–22 (trusts) (Minn. CLE 2009). Hence, it is not surprising that we have previously looked to the Minnesota probate code for guidance in interpreting the terms of an inter vivos trust. *See United States v. O'Shaughnessy,* 517 N.W.2d 574, 577 (Minn.1994).

Given the foregoing analysis, we conclude that the phrase "pay ... my legal debts," whether it is used in a last will and testament or in a trust, is a technical phrase that has a definite and well-understood meaning in Minnesota. We have previously explained that if grantors "persist in using words of technical import, without explanatory context, their beneficiaries cannot complain if courts continue to give such words effect according to their long-accepted legal definition." *Holden,* 207 Minn. at 216, 291 N.W. at 107 (quoting *In re Estate of Fretheim,* 156 Minn. 366, 194 N.W. 766, 768 (1923)). We see no reason to depart from that rule in this case. In fact, the plain language of the Trust Agreement supports the conclusion that Pamela used the phrase "pay ... my legal debts" according to that phrase's well-understood meaning. Significantly, the Trust Agreement tracks, nearly verbatim, the recommended language used in handbooks and guides for Minnesota prac-

---

**6.** When interpreting a will or trust, we may rely on other relevant sources of law for assistance. For example, in *In re Trust Estate of Thompson,* we looked to the statutes controlling intestate descent to help us ascertain the intent and meaning of a will. 202 Minn. 648, 652, 279 N.W. 574, 576 (1938); *see also In re Trust Under Will of Holden,* 207 Minn. 211, 215, 291 N.W. 104, 107 (1940) (referring to the rules of statutory construction to determine a testator's intent).

titioners, including using the same section numbers. A leading practitioner's guide recommends the following trust language:

### ARTICLE THREE
### TRUST ADMINISTRATION
### UPON MY DEATH

3. Upon my death, the trustees shall make distributions from the trust assets, including all property that becomes distributable to the trustees at my death, as follows:

 3.1 The trustees, if requested by the personal representative of my estate shall, or in their own discretion may, directly or through the personal representative of my estate, pay:

 3.1.1 the expenses of my last illness and funeral, valid debts and expenses of administering my estate, including my non-probate assets; provided that no such debts and expenses shall be paid from the proceeds of any insurance, retirement plan or other asset which but for this paragraph, would be exempt from liability for such debts and expenses. . . .

Tara D. Mattessich, *Drafting the Basic Trust, in* ABC's of Will and Trust Drafting, at 5–22 (Minn. CLE 2009). Pamela's Trust Agreement uses nearly identical language:

### ARTICLE 3
### EXPENSES AND TAXES UPON MY DEATH

3. *Payments.* After my death, the Trustees shall make distributions from the remaining trust estate, including all property that becomes distributable to the Trustees at or after my death, as follows:

 3.1 *Expenses and Taxes.* The Trustees shall, if requested by the legal representative of my estate, or in their own discretion may, pay the following expenses, debts and taxes, directly or through the legal representative of my estate by way of advancement to or reimbursement of said legal representative:

 3.1.1 *Expenses.* The expenses of my last illness, funeral, burial or other disposition, unpaid income and property taxes properly chargeable against my estate, expenses of administration of my estate, including my non-probate assets, and my legal debts.

We must read the standard debt-payment clause found in Trust Agreement section 3.1.1 in accordance with the well-established and long-accepted meaning that courts and practitioners in this state have ascribed to such a phrase.[7] *Cf. In re Trust Created by Last Will of Davidson,* 223 Minn. 268, 272, 26 N.W.2d 223, 225–26 (1947) ("[I]t is to be presumed that the testator, in using . . . technical words . . . , which have a definite and long-accepted meaning, used them correctly and with the intent that they be interpreted in conformity with the law."); *see also Holden,* 207 Minn. at 217–18, 291 N.W. at 107–08 (reasoning that technical words should be given their technical meaning when another meaning is not apparent). Therefore, we conclude that the Trustee is not required

---

7. Stisser argues that any characterization of a standard debt-payment clause as both "boilerplate" and "technical" is contradictory. We disagree. The word "technical" could mean "marked by or characteristic of specialization," a concept not typically associated with boilerplate. *Webster's Third New International Dictionary* 2348 (2002). But "technical" is also defined as "of or relating to a particular subject." *Id.* In the context of our interpretation of a legal document, we have employed the latter definition of "technical," giving even *unspecialized* words their well-understood *legal* meaning. *See, e.g., In re Trust Created by Last Will of Davidson,* 223 Minn. 268, 272–73, 26 N.W.2d 223, 225–26 (1947) (drawing a legal distinction between use of "such technical words as 'majority' and 'minority' ").

to pay the debts secured by Pamela's personal and real property at the time of her death.

The Trust Agreement's other provisions also support our interpretation of section 3.1.1. *See In re Trusteeship Created by Fiske,* 242 Minn. at 460, 65 N.W.2d at 910 ("[T]he intention of the [grantor] . . . must be ascertained from the trust instrument in its entirety."). In particular, the Trust Agreement makes clear that Pamela intended for her children and step-children, not Stisser, to be the Trust's remainder beneficiaries. In fact, Pamela expressly omitted Stisser as a Trust beneficiary when she stated in Trust Agreement section 12.4.5: "I have intentionally omitted from this instrument any provisions for my spouse, VERN STISSER. . . ." *Cf. In re Trusts Created by Butler,* 223 Minn. 196, 205, 26 N.W.2d 204, 210 (1947) (reasoning that a trust's expenses and fiduciary compensation provision "should not be given such a literal and narrow construction that the subject matter and purpose of [the grantor's] bounty are forgotten").

Stisser makes an additional argument that extrinsic evidence reveals Pamela's intention that the Trust pay all of her debts at the time of her death, including the mortgage notes and the margin loan.[8] Stisser points specifically to extrinsic evidence that Pamela told him during her lifetime that if he survived her, she intended for the Trust to pay off the couple's debt so that he could live debt free. Here, however, we need not look to extrinsic evidence of Pamela's intent. "When the trust language is clear and unambiguous, we do not look beyond the [trust] instrument." *McLaughlin,* 361 N.W.2d at 45 n. 1; *see also In re Campbell's Trusts,* 258 N.W.2d 856, 864 (Minn.1977) ("Where the intent of the testator-[grantor] is clear from the language of the instrument, parol evidence is not admissible. . . .").

For all of these reasons, we conclude as a matter of law that Pamela's unambiguous intent, as expressed in the Trust Agreement, was not to exonerate her secured debts.[9] We therefore reverse the decision of the court of appeals that the Trustee must pay the Schwab account margin loan and in doing so we affirm the decision of the district court.[10]

---

**8.** "Extrinsic evidence" is evidence relating to the trust instrument but not appearing in the instrument's plain language because "it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement." *Black's, supra,* at 637.

**9.** Stisser argues in the alternative that if the Trust Agreement does not require the Trustee to pay the debts secured by Pamela's real and personal property, Stisser is nevertheless entitled to "equitable contribution" for the debt secured by the three mortgages. Equitable contribution is an equitable doctrine that allows a surviving spouse to seek payment from his or her spouse's estate "in reimbursement of the payment by the survivor of more than his equitable share of their joint obligation" on debts secured by real property. *See* C.C. Marvel, Annotation, *Right of Surviving Spouse to Contribution, Exoneration, or Other Reim-*

*bursement out of Decedent's Estate Respecting Liens on Estate by Entirety or Joint Tenancy,* 76 A.L.R.2d 1004, 1007, § 2 (1961). We review a district court's denial of equitable relief for an abuse of discretion. *See Citizens State Bank v. Raven Trading Partners, Inc.,* 786 N.W.2d 274, 277 (Minn.2010). Stisser concedes that our court has never held that a surviving spouse is entitled to equitable contribution for a mortgage on jointly-owned real property. We conclude that the district court did not abuse its discretion in declining to adopt an equitable remedy previously unrecognized in this state.

**10.** Because we hold that Pamela did not intend for the Trust to pay any secured debts, we do not reach the issue of whether Stisser was acting in his capacity as the personal representative of Pamela's probate estate in requesting payment of the secured debts. *See Stisser,* 2011 WL 2119394, at *3–4.

## II.

We next address Stisser's claim that the Trust must pay personal representative compensation and the fees of Florida attorney Laird A. Lile. The Trustee did not pay these claimed expenses because Stisser failed to support his claims with sufficient documentary evidence and, as a result, the Trust Agreement did not direct the Trustee to pay Stisser's claims. The district court agreed with the Trustee, concluding that the Trust Agreement did not require the Trustee to pay these claimed expenses. The court of appeals affirmed the district court's decision on this issue. We also affirm.

 An award of fiduciary compensation or attorney fees rests largely within the district court's discretion. *See In re Baumgartner's Estate,* 274 Minn. 337, 346, 144 N.W.2d 574, 580 (1966) (attorney fees); *In re Simmons' Estate,* 214 Minn. 388, 397, 8 N.W.2d 222, 226 (1943) (personal representative compensation). The reasonable value of compensation or reimbursement is a question of fact. *See Baumgartner,* 274 Minn. at 346, 144 N.W.2d at 580. We review a district court's findings of fact under the clearly erroneous standard. *City of North Oaks v. Sarpal,* 797 N.W.2d 18, 24 (Minn.2011) (citing Minn. R. Civ. P. 52.01). When determining whether a finding is clearly erroneous, we "take[ ] the view of the evidence which is most favorable to the [district] court's findings," *Trondson v. Janikula,* 458 N.W.2d 679, 682 (Minn.1990), and defer to the district court's opportunity to assess the credibility of witnesses, *Sefkow v. Sefkow,* 427 N.W.2d 203, 210 (Minn.1988) (citing Minn. R. Civ. P. 52.01). Findings of fact are not clearly erroneous unless we are "left with the definite and firm conviction that a mistake has been made." *Rogers v. Moore,* 603 N.W.2d 650, 656 (Minn.1999) (citation omitted).

### A. Personal Representative Compensation

 Stisser argues that the district court erred by denying his request for $160,000 to compensate him for his services as the personal representative of Pamela's probate estate. Under Trust Agreement section 11.1, Stisser sought $80,000 for his time and labor—estimated by him at $13.00 per hour and 20 hours per week for nearly 7 years of estate administration—and an additional $80,000 due to the "complexity" of the administration of the estate. Trust Agreement section 11.1 provides:

> My fiduciaries shall be entitled to reimbursement for expenses and to receive compensation for their services. Such compensation shall be based principally upon the time and labor required in order to fulfill their responsibilities hereunder, giving due regard to the complexity and novelty of any special problems or issues encountered in the administration of my estate or such trust, as well as the nature and extent of their responsibilities assumed and the results obtained in performing their duties.

The parties agree that Stisser is a fiduciary under the terms of the Trust Agreement.

Aside from Stisser's own unsubstantiated estimate of the time he spent administering the probate estate, the *only* evidence that Stisser identified to support his claim for compensation was the fact that the Trustee was "a party to or bankrolling all of the [probate estate's] Florida, Illinois, and Minnesota litigation" and thus the Trustee could rely on his own participation "as evidence of the time that [Stisser] spent on the same matters." Stisser failed to introduce any time records supporting his claimed compensation or identify any specific tasks he completed to bene-

fit the estate. Given what the district court characterized as a "dearth of information" provided by Stisser, that court determined that Stisser's claim for compensation was unsupported by the record.

To support his claim, Stisser cites *In re Bush's Estate*, 304 Minn. 105, 230 N.W.2d 33 (1975). In *Bush*, we affirmed a fee award to executors despite the absence of "detailed time records" supporting the executors' claim for compensation. *Id.* at 126–27, 230 N.W.2d at 45–46. We explained that the award was justified in part because the executors' work benefited the estate. *Id.* at 126, 230 N.W.2d at 45. We further observed that the party opposing the award had produced no testimony to contradict the executors' claim. In particular, we noted: "If the amounts claimed were so excessive, one wonders why appellants did not come forward with expert testimony." *Id.* at 126, 230 N.W.2d at 45.

We agree with the district court that *Bush* is distinguishable. Three factors support our conclusion. First, in *Bush*, we concluded that no "*detailed* time records" were required to support the court's award. *Id.* at 126, 230 N.W.2d at 45 (emphasis added). But we did not hold that a court must award compensation when there are *no* time records to support a fiduciary's claim. Second, unlike in *Bush*, the Trustee here produced two expert witnesses who supported the Trustee's denial of compensation. Professor Amy Morris Hess, who the district court recognized as an expert on trust law, testified that the Trustee had insufficient information to determine the reasonableness of Stisser's claimed compensation. E. Thomas Welch, a professional trustee, testified that the complete lack of records was not in accord with accepted customs and practices in Minnesota. *Cf. In re Simmons' Estate*, 214 Minn. 388, 397, 8 N.W.2d 222, 226 (1943) ("When an administrator comes into court with an account as to his charges, he should be able to present a bill of particulars specifying time and dates and character of services rendered."). Third, in direct contrast to *Bush*, the court found that Stisser's 7 years of probate estate administration "have been, almost across the board, of no benefit to [Pamela's probate] [e]state." The court also found that Stisser unnecessarily prolonged the litigation between these parties by "d[igging] in his heels."

The district court, reviewing nearly 7 years of litigation and legal wrangling, quite admirably articulated detailed findings of fact based on the evidence and the testimony in the record. Based on this record, we cannot say that we are left with a "definite and firm conviction that a mistake has been made." *Rogers*, 603 N.W.2d at 656. Quite the contrary, we are left with a definite and firm conviction that the court made no mistake.

As previously noted, we must analyze the district court's decision to deny compensation to Stisser under a deferential standard of review—whether the court abused its discretion. *See Baumgartner*, 274 Minn. at 346, 144 N.W.2d at 580. A district court abuses its discretion when its decision is based on an erroneous view of the law or is inconsistent with the facts in the record. *Sarpal*, 797 N.W.2d at 24. Here, there is substantial evidence to support the court's conclusion. Further, the complete lack of evidence supporting Stisser's claim leaves us in no position to question the court. Thus, while we do not hold that detailed time records are absolutely necessary to substantiate a personal representative's claim for compensation, we conclude that the district court did not abuse its discretion when there was a "complete lack of [time] records" to support Stisser's claim and Stisser's conduct as personal representative did not benefit the probate estate.

Stisser makes an alternative argument that the district court applied the incorrect standard of review when it denied compensation. Stisser contends that the court incorrectly reviewed the Trustee's denial of compensation under a deferential "reasonableness" standard of review. Specifically, Stisser asserts that the court should have applied a de novo standard of review to the Trustee's actions because the terms of Trust Agreement section 11.1 are mandatory rather than discretionary.

■■■■ The United States Supreme Court has stated that whether a trustee's exercise of a power is mandatory or discretionary " 'depends upon the terms of the trust.' " *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (quoting 3 W. Fratcher, *Scott on Trusts* § 187, at 14 (4th ed.1988)). When a trustee's exercise of power is discretionary, a court will generally interfere with the trustee's decisions only to prevent an abuse of discretion. *See In re Campbell's Trusts,* 258 N.W.2d 856, 866 (Minn.1977); Restatement (Second) of Trusts § 187. If a trust's terms require mandatory action, there is no deferential review. *Cf. Bruch,* 489 U.S. at 111, 109 S.Ct. 948; Restatement (Second) of Trusts § 187, cmt. a.

Here, Trust Agreement section 11.1 provides that Pamela's "fiduciaries *shall ...* receive compensation for their services." (Emphasis added.) We agree with Stisser that the word "shall" generally "reflects a mandatory imposition." *Travertine Corp. v. Lexington–Silverwood,* 683 N.W.2d 267, 272 (Minn.2004). Nonetheless, we conclude that the district court would have denied Stisser's claim for compensation even under a less deferential standard of review, such as de novo review. In regard to Stisser's claim, the court explained:

Even if the Court were inclined to instruct the Trustee to give compensation to [Stisser] from the Trust, with no records over the period from February 2004 to the present and no testimony from [Stisser] assigning his time and labor to the various and numerous issues embroiling the Estate ..., there is no way for the Court to ascertain what that amount should be.

Therefore, we conclude that whichever standard of review we apply, we must affirm the decision of the district court denying compensation to Stisser as the personal representative of Pamela's probate estate.

### B. Estate Administration Expenses

■■■ Stisser also claimed reimbursement for the services of the probate estate's Florida attorney, Laird A. Lile. The claim for Lile's services was in the amount of $266,126.09. Before trial, during the parties' dispute over payment for Lile's attorney fees, Stisser declined repeated requests from the Trustee for unredacted invoices documenting Lile's hourly rates and the time that Lile spent on each task he performed for the estate. Instead, Lile offered to provide unredacted invoices only if the Trustee promised to reimburse the estate for Lile's attorney fees. The Trustee refused to promise reimbursement based on invoices he had never seen, and Stisser provided the Trustee with only heavily-redacted invoices. The district court concluded that it was "reasonable for the Trustee not to pay [Lile's attorney fees] ... because [Stisser] did not supply the Trustee with any documentation on which to make a reasoned decision." [11]

■■■ As we explained above, we typically will not interfere with a district court's

---

11. The court found that Lile's invoices "completely lack the amount of time spent on each item of work, the hourly rate sought for the work performed and a detailed itemization of all amounts sought for disbursements or expenses."

award of attorney fees absent an abuse of discretion. *Baumgartner*, 274 Minn. at 346, 144 N.W.2d at 580. Stisser argues, however, that we may review de novo his claimed reimbursement for Lile's attorney fees. Stisser points out that after the first day of trial, he offered to produce unredacted invoices for the district court to review *in camera.* Although the court declined to review the unredacted records, the court made the invoices part of the record. Stisser now asks our court review these unredacted invoices de novo and award reimbursement. *See City of Duluth v. State,* 390 N.W.2d 757, 762 (Minn.1986) ("[A] [district] court's findings of fact will be subject to review *de novo* where those findings are based on documentary evidence equally available to this court."). We decline Stisser's invitation. The district court refused to review the unredacted invoices because the invoices "should have been given to ... the Trustee as part of discovery and not one day after the trial in this case had begun." In essence, the court held Stisser accountable to his pretrial strategy of refusing to hand over unredacted records to the Trustee and the court only considered the evidence known to the Trustee at the time the Trustee refused to reimburse the probate estate for Lile's fees. We agree with the district court's approach and will consider only whether the district court's decision to deny reimbursement was an abuse of discretion.

At trial, Lile testified that he was unable to identify what information had been redacted from his invoices and that he would "struggle" to identify the specific tasks described in some of his invoices. Further, the Trustee produced expert testimony that the documentation provided by Stisser would not have justified reimbursement. In particular, Professor Hess testified that she was unaware of any case requiring a trustee to pay attorney fees based only on redacted invoices. On this

record, the district court correctly concluded that the Trustee adhered to his fiduciary duty of loyalty to the Trust and its beneficiaries by refusing to reimburse Stisser for Lile's attorney fees.

Based on the record before us, therefore, we cannot say that the district court's decision was based on an erroneous view of the law or lacks evidentiary support. *See Sarpal,* 797 N.W.2d at 24; *see also Campbell,* 258 N.W.2d at 868 (noting that the "primary function" of a court in directing the actions of a trustee is to "preserve" the trust and "to secure [its] administration according to [its] terms"); *In re Trusteeship by Sheridan, Colo.,* 593 N.W.2d 702, 708 (Minn.App.1999) ("A trustee owes a fiduciary duty to the beneficiaries of the trust.") (quoting *Wright v. Wright,* 182 Colo. 425, 514 P.2d 73, 75 (1973) (internal quotation marks omitted)). We agree with the court of appeals that the total denial of any reimbursement for Lile's attorney fees may appear to be "harsh." *Stisser,* 2011 WL 2119394, at *6. But our review of the record does not reveal that the district court's detailed findings of fact were clearly erroneous or that the court's well-reasoned conclusions, based on those findings, were an abuse of discretion. Therefore, we affirm the decision of the district court denying Stisser's claim for reimbursement for Lile's attorney fees.

We affirm in part and reverse in part the decision of the court of appeals and remand the case to the district court for further proceedings consistent with our opinion.

PAGE, J., took no part in the consideration or decision of this case.