**John W. WESTLING, et al., petitioners, Respondents,**

v.

**COUNTY OF MILLE LACS, Relator.**

No. C1–95–979.

Supreme Court of Minnesota.

Feb. 2, 1996.

John C. Hoffman, Elizabeth K. Moore, Elk River, Jennifer A. Fahey, Mille Lacs County Atty., Milaca, for appellant.

Ross L. Thorfinnson, William F. Lucas, Eden Prairie, for respondent.

## OPINION

COYNE, Justice.

Certiorari on the relation of the County of Mille Lacs to review a decision of the tax court directing reduction of the assessor's estimated market value as at January 2, 1992 of a tract consisting of two contiguous parcels of real estate from $470,100 to $0, and further directing reduction of the assessor's estimated market value as at January 2, 1993 of the same tract of land from $876,800 to $0. We affirm.

This is the third time the estimated market value of this 13.06–acre tract of real estate has come before us. The factual background of this ongoing dispute is set out in detail in our original decision, *Westling v. County of Mille Lacs*, 512 N.W.2d 863 (Minn. 1994), but for convenience those facts relevant to the present proceeding will be included here.

In 1987 John and Sharolyn Westling purchased from Donald W. Westling, John's father, a 5–acre parcel of land situated in Princeton, Minnesota. In 1988 John and Sharolyn Westling built a 28,000–square–foot office and warehouse which was connected to the manufacturing and warehouse buildings situated on the adjacent land owned by Donald and leased to Westling Manufacturing Company, a remanufacturer of automotive parts.

In 1989 the Westlings purchased Donald's contiguous 8.06–acre parcel on which the 48,500–square–foot manufacturing building and the 15,000–square–foot warehouse building are located. Before the 1989 purchase was completed, an environmental survey disclosed the presence throughout the entire 13.06–acre tract of environmental contamination by tetrachloroethylene, a volatile organic compound used by Westling Manufacturing Company as a degreaser. John Westling concedes that he completed the purchase of the 8.06–acre parcel knowing that it was listed on the Comprehensive Environmental Response Compensation and Liability Information System (CERCLIS). The acquisition of the tract with its improvements was financed by a $1,000,000 mortgage secured by the real estate, the Westling Manufacturing Company lease, and personal and corporate guarantees.

Subsequent to the purchase of the 8.06–acre parcel, the Minnesota Pollution Control Agency listed the 13.06–acre tract on the State Superfund Permanent List of Priorities. The property has since remained on both the CERCLIS and MPCA Superfund lists. The MPCA has also named John Westling as a responsible party because he and his wife owned the property and because he knowingly permitted the Company to use a hazardous substance.[1]

The earlier proceedings concluded with affirmance of the tax court's determination that the assessor's estimated market value of the tract at January 2, 1991 should be reduced from $974,200 to $880,000. When the assessor set the estimated market value of the tract as at January 2, 1992 at $470,100 and at $876,800 as at January 2, 1993, the Westlings objected, contending that the property had no market value on either January 2, 1992 or January 2, 1993.

Shortly after purchasing the 8.06–acre parcel, the Westlings contracted with Wenck Associates for testing to determine the nature and extent of contamination and engineering advice concerning treatment. Although about $560,000 had been expended from January 2, 1992 to November 30, 1994, to investigate, test, monitor, and cure the contamination, an environmental engineer employed by Wenck estimated the present value of the future cost of clean-up at $2,800,000 to $2,900,000: (A) The present value of the cost of a single far-field system of treatment, projected to be performed over a 24year period, is $2,800,000; or (B) the present

1. John Westling, who has worked for Westling Manufacturing Company since 1969, is the president of the company.

value of the cost of a double far-field system, which could be expected to be completed in 12 years, is $2,900,000.

Peter J. Patchin, an appraiser called by the Westlings, testified that if "unimpaired" the tract would have had a market value of $1,350,000 on January 2, 1992 and January 2, 1993. After deducting the loss of value resulting from the stigma attached to polluted properties and the present value of the anticipated costs of clean-up, Mr. Patchin was of the opinion that the market value of the tract was -$2,835,000 on January 2, 1992 and -$2,760,000 on January 2, 1993.

Charles R. Glassing, an appraiser called by the County, deducted a stigma discount and an estimated clean-up cost from the value indicated pursuant to the replacement cost, market or sale comparison, and income capitalization methods of evaluation and gave as his final opinions of value: $930,000 at January 2, 1992 and $900,000 on January 2, 1993.

The tax court regarded the modified traditional appraisal methodology adopted by each appraiser acceptable. Remarking that the significant differences in the two opinions with respect to value lay in the facts supporting the stigma discount and cost to cure, not in the methods employed, the tax court concluded that Mr. Patchin's evaluation was the more accurate and reliable.

The Patchin stigma discount was based on a market case study of 14 improved industrial properties sold after clean-up of contamination, while the Glassing stigma discount was based on published studies, including an article written by Mr. Patchin.

Mr. Glassing's cost-to-cure figures were based on an August 1992 letter from the Wenck environmental engineer to John Westling and the engineer's testimony in the proceedings with respect to the market value of the tract on January 2, 1991, when the engineer estimated the cost of clean-up at $910,000 over a 10-year period—an expenditure which then had a present value of $400,000.

The tax court accepted Mr. Patchin's cost-to-cure figures because they were based on the environmental engineer's current cost estimates, and because neither appraiser suggested that the market value of the property, unimpaired by contamination, was greater than the $2,800,000 cost to cure, the tax court directed the reduction of the assessor's estimated market value to $0 as at January 2, 1992 and January 2, 1993.

Although we can understand the frustration of the County over the paradox posed by attaching a zero market value to 13.06 acres of improved real estate which generates $114,000 in annual rent, the evidence before the tax court concerning stigma discount and the cost of cleaning up the contamination amply support its order directing reduction of the assessor's estimated market value to $0 as at January 2, 1992 and January 2, 1993.

Affirmed.