**ALMOR CORPORATION,
et al., Relators,**

v.

**COUNTY OF HENNEPIN, Respondent.**

No. C6–96–1796.

Supreme Court of Minnesota.

July 17, 1997.

Rehearing Denied Aug. 18, 1997.

---

Fredrikson & Byron, P.A., Thomas R. Wilhelmy, Thomas R. Muck, Minneapolis, for Relators.

Michael O. Freeman, Hennepin County Attorney, Marilyn J. Maloney, Assistant County Attorney, Minneapolis, for Respondent.

## OPINION

BLATZ, Justice.

Relators, Almor Corporation and its tenant, Cardinal IG, petitioned the Minnesota Tax Court for review of property tax assessments of Almor's contaminated property located at 7115 West Lake Street, St. Louis Park, Minnesota. The St. Louis Park assessor estimated the market value on January 2, 1991, and January 2, 1992, to be $1,625,800. Relators ("Almor") appealed the assessment value for 1991 and 1992 to the tax court which found the fair market value of the property in both years to be $1,038,500. In making its decision, the tax court rejected Almor's argument that the cost to clean up the contamination should be deducted from the market value in calculating valuation estimates using the market and income method approaches. We agree that, under the facts presented here, Almor was not entitled to a deduction for the cost of cleanup. We therefore affirm.

The essential facts in this case are not in dispute. Almor Corporation owns the subject property. Cardinal IG Company, which assembles insulated windows, was the sole tenant on the assessment dates. The property is approximately 183,828 square feet in size and improved with a slab-on-grade building constructed in 1962. An office addition was added in 1982 and an office/warehouse addition was added in 1986.

The Almor property is located about 1/4 mile southeast of land that was used by the Reilly Tar and Chemical Company ("Reilly Tar") from approximately 1917 to 1972. The Reilly Tar site, which is listed on the Minnesota and National Priorities lists (Superfund lists), contains creosote and polynuclear aromatic hydrocarbons which are hazardous, toxic, and carcinogenic. Reilly Tar site, which distilled coal tar and treated wood products on its property, discharged contami-

nated waste water into a well on the Reilly Site. This discharge contaminated at least four underground water tables. Reilly Tar also discharged contaminated waste water into nearby ponds and wetlands. The Reilly Site contamination has migrated to the south and southeast.

In 1986, Reilly Tar, the City of St. Louis Park, and the state and federal governments reached an agreement on the appropriate remedial action plan (RAP) designed to provide safe drinking water to nearby communities and to control the spread of contamination. Reilly Tar and the City of St. Louis Park are paying for the monitoring costs and two monitoring wells are located on the Almor property. The monitoring will continue for decades.

The contamination from the Reilly Site has contaminated the soil and ground water beneath the Almor property. The Almor property, however, is not included on the Superfund lists, and the RAP does not address the cleanup of the property's soil.

On May 15, 1992, Almor petitioned the tax court for review of the 1991 assessment. The next year, Cardinal IG petitioned the tax court for review of the 1992 assessment.

The hearing before the tax court began July 25, 1995, and lasted 12 days. The tax court heard testimony from environmental experts Barry D. O'Flanagan and William Gregg. The tax court also received a Phase II environmental report[1] which included soil remediation cost estimates ranging from $1,066,000 to more than $54,000,000. However, O'Flanagan, the expert called by Almor, testified that because there was no way to stop the continued flow of contaminated ground water through the subject property, remediation methods will not effectively clean the soil. To date, no action to clean up the soil has been taken, and the petitioners do not contend that any cleanup is planned.

Additionally, the evidence at the tax court hearing included the testimony and written appraisals of several appraisers. Stephen Baker, CMA, appraiser for the City of St.

Louis Park, testified for the county. Dennis E. Taylor, MAI, SRA, testified for the petitioners. Also testifying for the petitioners was Peter J. Patchin, MAI, an authority in the appraisal of contaminated property. Patchin testified about the valuation of contaminated property, but did not offer an opinion as to the value of the Almor property. Patchin's testimony focused in part on a set of 14 case studies he had conducted of contaminated properties. These 14 case studies were used extensively by Taylor and the tax court to determine the value of the Almor property. Baker, however, did not rely on the Patchin case studies to estimate the value of the property.

Both Taylor and Baker employed the market, income, and cost approaches to valuation and then modified these traditional approaches to account for the effects of contamination. Taylor first estimated the "unimpaired" value of the property and then adjusted each approach to account for the contamination. Baker did not use this two-step, unimpaired/impaired process. Rather, he made adjustments for contamination as needed.

Under the market approach to value, Taylor, the appraiser for Almor, first estimated the unimpaired value of the property at $1,600,000 in 1991 and 1992. Taylor then made a deduction for a 75 percent stigma discount ("stigma rate"), amounting to $1,200,000. Taylor based his stigma rate in part on 5 of the 14 case studies compiled by Patchin which all had groundwater contamination and which had an average stigma rate of 55 percent. To the 55 percent stigma rate, Taylor added a 20 percent premium because the contamination on the subject property cannot be cleaned up and because no primary responsible party has been designated. From the $400,000 remaining value, Taylor deducted for the cost of cleanup. He concluded that the market value of the property under the market approach was a negative $666,000 in 1991 and a negative $708,500 in 1992.

1. A Phase I assessment evaluates whether a reasonable basis exists to suspect the presence of an environmental risk. A Phase II assessment is designed to demonstrate scientifically whether the suspected risk is present.

Baker, the appraiser for St. Louis Park, performed a traditional market approach using 16 improved property sales, 10 of which were affected by contamination and 6 of which were "clean" or "untouched by environmental contamination." He made a 15 percent downward adjustment for the "effect of contamination" difference between his clean comparable and the subject property.[2] Baker then arrived at 1991 and 1992 market approach values for the subject property "as is." Baker valued the property at $1,501,000 under the market approach for 1991 and $1,467,000 for 1992.

Next, the experts made an estimation of value based on the income approach. Taylor started with a 10.5 percent "unimpaired" overall capitalization rate of return based on market sales. To arrive at a capitalization rate for the contaminated property, Taylor then added 15 percent to the "unimpaired" capitalization rate. He based this increase on two things: two Patchin studies which had an average capitalization rate of 26.65 percent and the belief that an investor in contaminated property would expect to recover the capital investment over a shorter period of time. Taylor then added another 20 percent premium to the contaminated capitalization rate to reach a final capitalization rate of 45 percent because of the additional risk posed by the fact that the site cannot be cleaned up. Despite the fact Taylor stated that no cleanup was possible, he then deducted the cost to clean up the property to arrive at values of negative $660,000 for 1991 and negative $700,000 for 1992.

Baker performed a traditional income approach. He reviewed 10 sales from 1988 to 1992 that showed capitalization rates ranging from 6.8 percent to 13.1 percent. Baker concluded that a capitalization rate of 11.5 percent was appropriate for the Almor property. Applying this capitalization rate, Baker concluded that the value of the Almor property was $1,534,400 in 1991 and $1,532,300 in 1992.

The last approach to value used by the experts was the cost approach. Taylor estimated the costs to demolish the building, cure the soil contamination and rebuild the building[3] and reached a market value of negative $1,887,000 for the property in 1991 and a negative $1,927,000 for the property in 1992. Baker performed a traditional cost approach which included a 25 percent adjustment for economic obsolescence due to contamination. As a result of this approach, Baker reached market values of $1,814,000 in 1991 and $1,853,000 in 1992. He did not deduct for the cost to clean up the property.

After applying the three traditional approaches to the valuation of property, Taylor and Baker made their final determinations of value. Taylor concluded that the property had a negative value of $1,887,000 on January 2, 1991, and a negative value of $1,927,000 on January 2, 1992. In contrast, Baker concluded that the property had a value of $1,540,000 on January 2, 1991, and $1,480,000 on January 2, 1992. A critical reason for the disparity in values lies in the fact that Taylor deducted for the cost of cleanup while Baker did not.

The tax court then made its determination of value. In making its decision, the tax court reviewed the experts' valuations. Of the three approaches, the tax court placed the least weight on the cost approach. The tax court agreed with Baker that this approach should not be relied on because of the building's age and the difficulty in estimating depreciation. Further, the tax court found that Taylor's suggestion that the building be destroyed to clean the soil underneath to be absurd.

---

**2.** Baker based this discount rate on four contaminated comparable sales. Baker concluded that the comparable sales indicated a discount value ranging from 0 to 7 percent. Baker then adjusted comparable sales of uncontaminated property downward 15 percent—more than twice the discount value he found from the contaminated comparable sales—to make the uncontaminated sales reflect the prices the properties would have sold for had the properties been contaminated. When the comparable sales were of contaminated properties similarly impacted from the Reilly Tar site, Baker did not make adjustments.

**3.** The complete destruction of the building was alleged to be necessary in order to remove the contaminated soil beneath the building and to replace it with clean soil.

In reaching its final estimate of market value, the tax court relied on the market and income approaches. The tax court first turned to the market approach and reviewed the sales comparables entered into evidence by Baker and those sales comparables contained in the Patchin studies (and relied upon by Taylor) and then rejected Baker's 15 percent and Taylor's 55 percent downward adjustments for stigma. Finding no market support for it, the tax court also rejected Taylor's 20 percent premium which would have resulted in a stigma rate of 75 percent. Instead, the tax court relied on six Patchin studies it determined to be most comparable to arrive at a stigma rate of 33 percent.

The tax court then reviewed the income approach and noted that the difference in capitalization rates used by the experts was significant (Baker 11.5 percent, Taylor .45 percent). The tax court also stated that the properties Baker relied on to reach an 11.5 percent capitalization rate might not be comparable to the subject property because they may not have significant concentrations of soil contaminants. The tax court noted that Taylor increased his impaired income approach capitalization rate from 10.5 percent to 25.5 percent to account for stigma and added another 20 percent because the environmental experts indicated there is no effective way to clean the contaminated soil and because no financially responsible person had been designated. As the tax court had done in the market value approach, it again rejected Taylor's 20 percent premium. The tax court refused to add 20 percent to the capitalization rate because the reasons cited by Taylor for doing so were some of the same reasons supporting a stigma discount. Thus, the tax court stated it was "left with" impaired income approach capitalization rate opinions from the appraisers of 11.5 percent and 25.5 percent. The court concluded that it would use a capitalization rate within the range of the two opinions and employed a rate of 18 percent.

Finally, in analyzing both the income and market approach valuations, the tax court rejected Taylor's position that the cost of cleanup ought to be deducted. The tax court agreed with Baker that no adjustment should be made for the cost of cleanup on the following grounds: 1) ground water contamination monitoring and cleanup is governed by the RAP and paid for by third parties, 2) there is no governmental mandate to clean up the subject property, and 3) no entity is in fact cleaning up the soil contamination.

The tax court went on to adopt the reasoning of *Weyerhaeuser Co. v. Easter*, 126 Wash.2d 370, 894 P.2d 1290 (1995). In *Weyerhaeuser*, the Washington Supreme Court held that a deduction for the cost of cleanup against value could be taken only when three factors were shown: "(1) the existence of contamination, (2) the existence of a requirement for cleanup, and (3) a reasonably certain estimate of the costs of cleanup, including a formal plan and timetable." *Id.* 894 P.2d at 1298. In reaching its final determination of market value, the tax court placed substantial weight on both the market and income approaches and held that the property had a market value of $1,038,500 on both January 2, 1991, and January 2, 1992.

On appeal to this court, Almor contends that the tax court erred as a matter of law by refusing to permit a deduction from the market value of the contaminated property for the cost of cleanup. A reviewing court is not bound by and need not give deference to a trial court's decision on a purely legal issue such as presented here. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984). Legal issues are subject to de novo review. *Equitable Life Assurance Soc'y v. County of Ramsey*, 530 N.W.2d 544, 552 (Minn.1995).

Almor argues that two recent cases mandate that cleanup costs be deducted. *Westling v. County of Mille Lacs*, 512 N.W.2d 863 (Minn.1994) (*Westling I* ) and *Westling v. County of Mille Lacs*, 543 N.W.2d 91 (Minn. 1996) (*Westling II* ).[4] Almor also contends

---

4. Almor also argues that the tax court's failure to permit a deduction for cleanup costs in all cases where the value of contaminated property is at issue would frustrate the operation of the Minnesota contamination tax, Minn.Stat. § 270.91–.98 (1996). Having been enacted in 1993, after the assessment dates at issue, the contamination tax is inapplicable, and we decline to speculate on

that the tax court ignored precedent by adopting the reasoning of the Washington Supreme Court in *Weyerhaeuser*.

■ We agree with Almor insofar as we decline to adopt the specific reasoning outlined in *Weyerhaeuser*. However, we also find that the tax court's decision to refuse to deduct the cost of cleanup in this case is entirely consistent with precedent and appropriate in the instant case. The *Westling II* rationale does not require that cleanup costs be deducted in all cases. Rather, the *Westling II* precedent is a permissive rule, allowing the deduction of cleanup costs under certain circumstances.

In *Westling II*, this court did permit a deduction for cleanup costs. 543 N.W.2d at 92. However, there are critical differences between *Westling II* and the case at hand. The Westling property was on the State Superfund Permanent List of Priorities and was in the process of being cleaned up. 512 N.W.2d at 865. Also, in *Westling II,* both appraisal experts agreed that the cost to clean up should be deducted and made such adjustments to their final valuations. 543 N.W.2d at 93.

Here, only Almor's expert, Taylor, thought it was appropriate to deduct for the cost of cleanup; Baker found such a deduction unwarranted. Moreover, the Almor property is not on a Superfund list and Almor offered no evidence that the property is being cleaned up or that it will ever need to be cleaned up. In fact, there was sufficient evidence to demonstrate that the property is unlikely to ever need to be cleaned up. Environmental Consultant Gregg, in his report submitted to the tax court, stated that neither the Minnesota Pollution Control Agency nor the U.S. Environmental Protection Agency will require additional remedial measures to address soil contamination off of the Reilly Site. Gregg, who testified for the county, further stated that costs for any additional remedial measures required by the agencies would be borne by the City of St. Louis Park and Reilly Tar. Baker, the St. Louis Park appraiser, also testified that cleanup would be unnecessary.

■ We hold that the existence of contamination, by itself, is insufficient to support a cleanup deduction for the purposes of estimating the value of property. Given the lack of evidence that cleanup would ever occur at the Almor site, the tax court properly refused to deduct the cost of cleanup in making its determination of value.

■ Second, Almor contends that the tax court erred when it used a 33 percent contamination stigma rate in valuing the property under the market valuation approach and by applying an 18 percent capitalization rate under the income valuation approach. When confronted with conflicting appraisals, a tax court may conclude that a compromise in valuation is required, provided it is not unreasonable or clearly erroneous and it has evidentiary support. *Northwest Racquet Swim & Health Clubs, Inc. v. County of Dakota,* 557 N.W.2d 582, 588 (Minn.1997). We have reviewed the entire record and conclude that the tax court's stigma and capitalization rates were not unreasonable and had sufficient evidentiary support.

■ Third, Almor contends that the tax court erred when it denied Almor's motion to compel discovery. Specifically, Almor sought sales information concerning properties on the Reilly Tar site. The tax court has considerable discretion in granting or denying discovery requests. *Montgomery Ward & Co. v. County of Hennepin,* 450 N.W.2d 299, 305 (Minn.1990). Such decisions by the tax court are reviewed under the abuse of discretion standard. *Id.* at 306. "Under this standard, a matter will not be disturbed on appeal unless the trial court abused its discretion, exercised its discretion in an arbitrary or capricious manner, or based its ruling on an erroneous view of the law." *Id.* In the instant case, the tax court carefully considered discovery issues on several occasions. Our review of the record reveals no abuse of discretion.

In conclusion, we hold that the tax court did not err when it refused to permit a deduction for the cost of cleanup, that the record provided sufficient support for the

capitalization and stigma rates adopted by the tax court, and that the tax court did not err when it refused to compel discovery.

Affirmed.