*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2295**

In Re: Amendment and Restatement of
Revocable Living Trust of Alfred J. Berget
dated February 15, 2005.

**Filed December 8, 2014
Affirmed as modified
Johnson, Judge**

Washington County District Court
File No. 82-CV-12-5268

Daniel A. Beckman, Sara N. Wilson, Gislason & Hunter LLP, Minneapolis, Minnesota
(for appellant Michael Berget)

Theresa M. Bevilacqua, Dorsey & Whitney LLP, Minneapolis, Minnesota (for
respondent LeeAnn Weigt)

Considered and decided by Hooten, Presiding Judge; Connolly, Judge; and
Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**JOHNSON**, Judge

The sole income beneficiary of a trust alleged that the trustee breached fiduciary
duties relating to the investment of trust assets and the distribution of income. After a
bench trial, the district court found in favor of the trustee. In post-trial proceedings, the
district court awarded the trustee most of the attorney fees and costs she sought. The
beneficiary appeals from both the decision on the merits and the award of fees and costs,

and the trustee cross-appeals from the partial denial of her request for fees and costs. We conclude that the district court did not err in its findings of fact or in its conclusions of law with respect to the beneficiary's claims of breach of fiduciary duties. We also conclude that the district court did not err in its award of attorney fees. And we further conclude that the district court did not err in its award of costs, with a few relatively minor exceptions. Therefore, we affirm as modified.

## FACTS

In 1996, Alfred J. Berget (hereinafter grantor) established a revocable living trust. Grantor amended the terms of the trust instrument in 2005 to provide income for his sole surviving adult child, Michael Berget (hereinafter Berget), after his death. Grantor appointed himself trustee during his lifetime and appointed LeeAnn Weigt, a first cousin, to serve as trustee after his death.

The trust instrument provides that, during grantor's lifetime, he had discretion to pay any amount of income or principal to himself. The trust instrument provides that, after grantor's death, the trustee "shall pay to [Berget] seventy percent (70%) of the net income of this trust at least quarter annually," and "[t]he remaining thirty percent (30%) of the net income of this trust shall be added to principal." The trust further provides that, after Berget's death or permanent admission to a nursing home, the trustee shall pay all of the net income of the trust to grantor's four grandchildren, two of whom are children of Berget and two of whom are children of a pre-deceased child of grantor. The trust instrument gives the trustee broad discretion to invest in "property of any kind," including "securities of any nature."

2

Grantor died in November 2006 at age 68. At that time, Berget was 43 years old, and the eldest grandchild was college-aged. After grantor's death, the assets of the trust consisted of approximately $1,100,000 in cash.

At the time of her appointment, Weigt had not previously served as trustee of a trust and did not have any training or experience with investing money. She co-owns a company that installs, maintains, and repairs on-site sewage treatment systems, and she manages the office staff. Shortly after grantor's death, his widow sent a handwritten note to Weigt, saying: "Contact Dave [Bjorklund]. He'll know what to do." Bjorklund had been a self-employed financial advisor for 35 years, selling life insurance and other financial products. Bjorklund had provided financial services and sold products to grantor during his lifetime. Before his death, grantor had informed Weigt that Bjorklund was his financial advisor, and asked Weigt to use Bjorklund because he trusted him and because Bjorklund "had done well for him."

Weigt met with Bjorklund in January 2007. Bjorklund prepared an investment plan and presented it to Weigt later that month. Bjorklund recommended to Weigt that she use $800,000 of the trust's liquid assets to purchase three variable deferred annuities. Bjorklund testified at trial that grantor had utilized variable deferred annuities during his lifetime and had told Bjorklund that he wanted the same investment vehicle and strategies to be utilized by the trust.

Weigt followed Bjorklund's recommendation by purchasing three variable deferred annuities, in the amounts of $300,000, $300,000, and $200,000. With Bjorklund's advice and assistance, Weigt invested the three premium amounts in a

3

Mellon Capital Management fund, which was comprised of individual stocks. The annuity contracts specified that the performance of the underlying investments would determine the value of the annuities. Dividends and interest would not be disbursed to the trust but would be reinvested. Annuity payments would not begin until the "income date," January 10, 2054, but Weigt could withdraw funds before that date. By paying additional fees at the outset, Weigt obtained the right to withdraw a certain amount before the income date without accruing early withdrawal fees and to guarantee the return of $600,000 of the initial premiums without regard to the performance of the underlying investments. After settling the estate and satisfying certain liabilities, the trust was comprised of the three annuities and approximately $198,000 in cash. With Bjorklund's assistance, Weigt used the remaining cash to establish a brokerage account by which the trust invested in mutual funds and ten stocks that are included in the Dow Jones industrial average.

Weigt began making payments to Berget in April 2007 based on her calculation of the net income of the trust. Weigt's method of determining the amount of income from the annuities was based on advice she received from two professionals: Heinrich Brucker, the attorney who helped grantor establish the trust, and Bjorklund. To determine the amount of income from the annuities, Weight referred to the increase or decrease in the value of the annuities' underlying investments during each quarter-year. If there was an increase in the value of the annuities during a particular quarter, Weigt considered the amount of the increase to be income. After considering the income received from other assets and the trust's expenses, Weigt paid Berget an amount equal to 70% of the trust's

4

net income. To fund those payments, she withdrew money from either the brokerage account or one of the annuities. If there was a decrease in value of the annuities during a particular quarter, Weigt did not recognize any income for that quarter with respect to the annuities.

Before Weigt purchased the variable deferred annuities, Bjorklund projected that the value of the annuities' underlying investments would increase by 10% each year. Given Weigt's method of determining income, Bjorklund projected that 70% of each year's increase in the value of the annuities (*i.e.*, 7% of the principal at the beginning of that year) would be paid to Berget as income, and that 30% of that increase in value (*i.e.*, 3% of the principal at the beginning of that year) would be retained and reclassified as principal, so that the principal essentially would reset on a quarterly basis. When Bjorklund presented his plan to Weigt, he prepared a document, which was introduced as an exhibit at trial, projecting that, by 2035, the total value of the annuities would be $2,250,474, which would allow the trustee to distribute more than $150,000 to Berget that year.

Bjorklund recognized that the value of the annuities' investments would not increase in a straight line. In the first three quarters of 2007, the value of the annuities increased. Weigt made payments to Berget of $13,049 for the first quarter, $25,374 for the second quarter, and $17,590 for the third quarter. But the value of the annuities decreased in the fourth quarter of 2007, and Berget received no distribution. The present value of the annuities decreased sharply in 2008 and 2009, from $748,615.34 on December 31, 2007, to $433,141.56 on December 31, 2009. Accordingly, Weigt made

5

fewer payments to Berget with respect to those periods. As of December 31, 2011, the present value of the annuities was $380,591.14.

In 2008, Weigt informed Berget that she would not make distributions until the value of the annuities recovered to the original amount, $800,000. Weigt testified that grantor had said, "when things were good, Michael would have a good year, and when things were not, Michael would not." Berget responded by telling Weigt that he expected regular payments. Weigt then sought advice from two attorneys to help decide whether to continue making payments to Berget before the value of the annuities recovered to the original investment amount. Brucker advised Weigt that the trust instrument required distributions that reflect any growth in value in a particular quarter. Weigt consulted another attorney, Randy Sayers, who also advised her to make payments on a quarterly basis whenever there was income. Bjorklund did not object to the attorneys' advice to continue making distributions to Berget even though the value of the annuities was below the initial investment amount. Berget's attorney expressed the view that Weigt should continue making distributions whenever the value of the annuities increases in a particular quarter. Weigt continued to make quarterly distributions to Berget whenever the value of the annuities increased in a particular quarter.

In early 2008, Weigt approached Bjorklund to discuss whether she should change the trust's investment strategy. Bjorklund advised against withdrawing the entire value of the annuities because the trust would lose the guaranteed-return option and would incur surrender fees. Bjorklund suggested that the trust would be better served by "staying the course" in the market. Bjorklund left the securities business in late 2009. In

6

January 2010, Weigt sought the advice of Joel Malick, who took over Bjorklund's clients and recommended certain changes to the investments. Weigt followed Malick's recommendations and reinvested the annuity premiums in a different fund.

In September 2012, Berget commenced this action against Weigt. He alleged that Weigt breached her fiduciary duties by investing imprudently and by distributing principal when she made quarterly distributions to Berget. While the lawsuit was pending, Weigt resigned as trustee, but the district court ordered Weigt to continue serving as trustee until Berget and the remainder beneficiaries could designate a successor trustee. Although the trust instrument provides for "fair and reasonable compensation," Weigt did not claim any compensation for serving as trustee.

In July 2013, the district court conducted a bench trial. At the time of trial, Berget had received $284,443.71 in distributions, and the present value of the trust's annuities was $386,927.34. At trial, four witnesses gave live testimony: Weigt, Brucker, Berget, and Weigt's expert witness, Ann Hart Wernz. The parties entered into evidence the deposition transcripts of Bjorklund and Berget's expert witness, Keith Loveland.

In August 2013, the district court issued a 41-page order and memorandum in which it concluded that Weigt did not breach her fiduciary duties. In November 2013, the district court granted in part and denied in part Weigt's motion for attorney fees and costs. Berget appeals from the district court's decision on the merits and from the awards of fees and costs; Weigt cross-appeals from the partial denial of fees and costs.

## DECISION

## I. Fiduciary Duties

Berget argues that the district court erred by concluding that Weigt did not breach her fiduciary duties.

A court's "purpose in construing a trust agreement is to ascertain and give effect to the grantor's intent." *In re Pamela Andreas Stisser Grantor Trust*, 818 N.W.2d 495, 502 (Minn. 2012). If the language of a trust is unambiguous, a court should discern the grantor's intent based on the plain language of the instrument, not based on extrinsic evidence. *Id.*; *In re Trust Created Under Agreement with McLaughlin*, 361 N.W.2d 43, 44-45 (Minn. 1985). A court generally will interpret the unambiguous words and phrases used in a trust instrument "according to their common and approved usage." *Stisser*, 818 N.W.2d at 502. But if the language of a trust is ambiguous, a court may ascertain the grantor's intent from extrinsic evidence. *See McLaughlin*, 361 N.W.2d at 45.

Berget's argument for reversal is multi-faceted. We perceive his appellate argument to have four parts, some of which are inter-related. First, Berget contends that Weigt breached her fiduciary duty because she purchased three variable deferred annuities. Second, Berget contends that Weigt breached her fiduciary duty because she selected primarily growth-oriented stocks as the underlying investments of the annuities. Third, Berget contends that Weigt breached her fiduciary duty to pay him 70% of the income of the trust. Fourth, Berget contends that Weigt breached her fiduciary duty because she did not re-evaluate the underlying investments of the annuities in 2010, after a prolonged period of poor performance.

Berget's arguments challenge the district court's findings of facts and conclusions of law. This court applies a clear-error standard of review to a district court's findings of fact. *Stisser*, 818 N.W.2d at 507. A finding of fact is clearly erroneous "only if the reviewing court is left with the definite and firm conviction that a mistake has been made." *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999) (internal quotations omitted). We will not disturb a district court's finding of fact if there is reasonable evidence in the record to support it. *Id.* After the relevant facts are settled, this court applies a *de novo* standard of review to a district court's conclusions of law. *Almor Corp. v. Cnty. of Hennepin*, 566 N.W.2d 696, 700 (Minn. 1997). This court also applies a *de novo* standard of review to the issue of whether a trust instrument is ambiguous. *Stisser*, 818 N.W.2d at 502.

## A.    Purchase of Variable Deferred Annuities

Berget contends that Weigt breached her fiduciary duty because she purchased three variable deferred annuities. Berget contends that it was unwise for Weigt to purchase the annuities primarily because they are costly and restrictive.

Berget's contention implicates Minnesota's prudent-investor rule, which provides, "A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust." Minn. Stat. § 501B.151, subd. 2(a) (2012). In satisfying this duty, a trustee "shall exercise reasonable care, skill, and caution." *Id.* A district court must evaluate a trustee's decisions "not in isolation but in the context of the trust portfolio as a whole and

9

as part of an overall investment strategy having risk and return objectives reasonably suited to the trust." Minn. Stat. § 501B.151, subd. 2(b).[1]

Berget's contention also implicates the nature of annuities. An opinion of the United States Court of Appeals for the Ninth Circuit provides useful definitions:

> An annuity is a contract between a seller (usually an insurance company) and a buyer (usually an individual, also referred to as the "annuitant") whereby the annuitant purchases the right to receive a stream of periodic payments to be paid either for a fixed term or for the life of the purchaser or other designated beneficiary. Traditional annuities, or annuities in which payment begins immediately or soon after purchase and the contract specifies the amount of each payment, are typically thought of as insurance products because the annuitant receives a guaranteed stream of income for life, and the insurer assumes and spreads the "mortality risk" of the annuity — the risk that the annuitant will live longer than expected, thereby receiving benefits that exceed the amount paid to the seller of the policy.
>
> In contrast, a deferred annuity is an accumulation product. The purchaser invests money and allows the value of the account to grow and then later on draws down the value of the account. In a fixed deferred annuity, the

---

[1]Before the enactment of this statute, a trustee was required by the common law, and later by statute, to "employ such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs." *In re Comstock's Will*, 219 Minn. 325, 332, 17 N.W.2d 656, 661 (1945); *see also* Minn. Stat. § 501B.10, subd. 1(a) (1994). Minnesota's prudent-investor statute is modeled after the Uniform Prudent Investor Act. *See* 1996 Minn. Laws ch. 314, § 4(1), at 191-93 (codified at Minn. Stat. § 501B.151). Minnesota's adoption of the prudent-investor rule in 1996 was part of a nationwide shift away from the traditional rule, which did not account for modern portfolio theory, encouraged overly conservative investing, and discouraged trustees from seeking professional advice. *See* Sjur Midness, *Minnesota's Prudent Investor Rule: Aligning Law with Practice*, 23 Wm. Mitchell L. Rev. 713, 719, 724-28, 733, 735 (1997). Under the current prudent-investor rule, a trustee may place assets in speculative investments, such as stocks, so long as doing so does not thwart the grantor's intent and is part of an overall investment strategy that is prudent. *See id.* at 728-30.

10

purchaser receives from the insurer an interest rate on the amount of premiums invested by the purchaser. *In a variable deferred annuity, the purchaser is not guaranteed a particular rate of return; instead, the purchaser invests in one or more professionally managed diversified investment products, offered through "separate accounts" of the insurance companies, and receives a rate of return that varies depending upon the success of the underlying investment.* Although deferred annuities have an investment component, they typically retain two insurance features: a guarantee of monthly payments for life and a benefit that is payable if the annuitant dies before the payout begins.

*Patenaude v. Equitable Life Assurance Soc'y*, 290 F.3d 1020, 1027 (9th Cir. 2002) (internal quotations and citations omitted) (emphasis added).

Under the prudent-investor rule, the general rule is that "[s]pecific investments or techniques are not *per se* prudent or imprudent." Restatement (Third) Trusts § 90 cmt. f (2007). This principle implies that a trustee is not necessarily imprudent by purchasing an annuity as an investment vehicle. In fact, secondary authorities recognize that "an annuity may offer a reasonable means of seeking to assure that a trust's periodic distribution requirements can be met." Restatement (Third) of Trusts § 90, cmt. k. In some states, the legislatures expressly have stated that trustees may purchase annuity contracts. *See* Ala. Code § 19-3-125 (2007 & Supp. 2013); Idaho Code Ann. § 68-406 (2006); Ind. Code Ann. § 30-1-5-1(2) (Lexis Nexis 2001); Ky. Rev. Stat. Ann. 386.020(1)(i) (Lexis Nexis 2010 & Supp. 2014); N.C. Gen. Stat. § 32-71(b) (2013); Ohio Rev. Code Ann. § 2109.37(A)(6) (Lexis Nexis 2011); Tenn. Code Ann. § 35-3-113(a) (2007 & Supp. 2014); *cf.* Iowa Code Ann. § 636.23(13) (West 2014) (limiting annuity contracts when specifically authorized by will). We are unaware of any state in which

trustees are forbidden from purchasing annuities. Thus, Berget must identify particular reasons why Weigt's purchase of the three deferred variable annuities constituted a breach of her fiduciary duty in this case.

The district court rejected Berget's claim in significant part because Weigt relied on the advice of a professional, Bjorklund, in deciding to purchase the three deferred variable annuities. Specifically, the district court found that, "based upon [grantor's] recommendation and her meetings and interactions with Mr. Bjorklund, it was reasonable and prudent for [Weigt] to retain and rely on the advice of Mr. Bjorklund." This finding is supported by the evidentiary record. In fact, it is undisputed that Weigt relied on Bjorklund's professional advice in deciding to purchase the three deferred variable annuities. Indeed, it was Bjorklund who first suggested deferred variable annuities as a vehicle for investing trust assets. The fact that Weigt was a lay trustee with no prior experience managing trust assets supports the district court's finding that it was reasonable for her to seek and rely on professional advice. In addition, Weigt testified that she received a "strong referral" to use Bjorklund because he had served as grantor's financial advisor. Furthermore, Weigt's expert testified that it is common for a trustee to retain a grantor's financial advisor to provide assistance with trust administration. Berget contends that the district court erred because Weigt placed too much reliance on Bjorklund's advice. This contention refers to a question of fact, and we must defer to the district court's findings of fact if they are not clearly erroneous. *See Stisser*, 818 N.W.2d at 507. In light of the evidentiary record, we conclude that the district court did not

12

clearly err by finding that Weigt reasonably relied on professional advice in deciding to purchase the three deferred variable annuities.

Based on its findings of fact, the district court concluded that Weigt did not breach her fiduciary duty by purchasing the three variable deferred annuities. The district court's legal conclusion is supported by the applicable law. The key provision of the prudent-investor act requires a trustee to "exercise reasonable care, skill, and caution" in managing trust assets. Minn. Stat. § 501B.151, subd. 2(a); *Norwest Bank Minn. N., N.A. v. Beckler*, 663 N.W.2d 571, 580 (Minn. App. 2003). Although we have some concerns about the suitability of the variable deferred annuities that Weigt purchased in light of the purposes of this trust,[2] we are reluctant to conclude that the district court erred by finding that a lay trustee did not breach her fiduciary duties by purchasing them after receiving and relying on professional advice from a financial advisor who previously served as a financial advisor to the grantor of the trust. For a lay trustee, reasonable care includes "securing and considering the advice of others on a reasonable basis." Restatement (Third) of Trusts § 90 cmt. d. As the Restatement explains,

---

[2]For example, annuity payments are deferred until 2054, at which time Berget will be 90 years old. It appears that the annuity contracts are unlikely to generate an income stream of the type normally associated with annuity contracts and, thus, are not designed to transfer any risk to the issuer of the annuity contracts. It also is questionable whether an annuity contract with an earlier income date would be desirable because the trustee has a duty to ensure the ability to pay income to the four remainder beneficiaries after Berget has died or no longer is entitled to income. The three annuity contracts also require the payment of fees if the trustee withdraws principal before the maturity date. Because the trustee is required to pay income to Berget, it appears that premature withdrawals were foreseeable. The annuity contracts give the trustee the right to redeem the contract for the amount of its highest market value, but the redemption must occur gradually over 20 years' time. By concluding that the district court did not err, we do not intend to endorse the trustee's approach.

13

> The duty to exercise both care and skill in investment management may require knowledge and experience greater than that of an individual of ordinary intelligence, depending on the investment strategy to be employed. This does not prevent an ordinarily intelligent person from serving as a trustee. In that role, however, such a person may have to take reasonable steps to obtain sufficient competent advice, guidance, and assistance in order to meet the standards of this Section and to formulate and implement a prudent investment strategy for the particular trust.

*Id.*; *see also Harley v. Minn. Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 908 (D. Minn. 1999) (holding that "prudence may have required" trustees overseeing employee retirement income plan to seek assistance in monitoring investments), *aff'd*, 284 F.3d 901 (8th Cir. 2002). Our conclusion on this issue should be understood as limited to the facts of this particular case. In another case involving an annuity contract, a different result may be appropriate. "Trust cases often present unique facts and circumstances that are difficult to analogize to other seemingly similar cases." *In re Trusts Created by Hormel*, 504 N.W.2d 505, 512 (Minn. App. 1993).

Thus, the district court did not err in its conclusion that Weigt did not breach her fiduciary duty by purchasing three variable deferred annuities.

## B. Selection of Underlying Investments

Berget also contends that Weigt breached her fiduciary duty because she selected primarily growth-oriented stocks as the underlying investments of the annuities.

The district court found that by investing in a Mellon Capital Management fund that was recommended by Bjorklund, Weigt "justifiably believed, at the time, that the proposed investment strategy was in keeping with the terms of the Trust Agreement and

14

the intent of [grantor]." The district court concluded that in considering the expected total return, Weigt "reasonably believed that the investments were a safe and conservative option for the Trust which would generate income for [Berget] while simultaneously protecting the principal for remainder beneficiaries."

On appeal, Berget contends that the investments selected by Weigt constitute a breach of the fiduciary duty of impartiality for two reasons: (1) the investments are geared toward long-term growth instead of current income, which Berget contends reduces the amount of income paid to Berget, and (2) the investments were too risky in light of market conditions, which Berget contends resulted in significant losses.

The first part of Berget's contention is flawed for two reasons. As an initial matter, the duty of impartiality requires the trustee to "manage the trust with equal consideration for the interests of all beneficiaries." *In re Great N. Iron Ore Props.*, 263 N.W.2d 610, 621 (Minn. 1978) (quotation omitted); *In re G.B. Van Dusen Marital Trust*, 834 N.W.2d 514, 521 (Minn. App. 2013). Accordingly, it was prudent, if not necessary, for Weigt in 2007 to consider the need for long-term growth as well as current income. Berget was only 43 years old at that time, and the four remainder beneficiaries were much younger. A prudent trustee would foresee the need for capital appreciation so that the trust is able to pay income to beneficiaries for several decades into the future. *See Great N. Iron Ore Props.*, 263 N.W.2d at 621-22; *see also* Minn. Stat. § 501B.151, subd. 2(c)(2) (providing that trustee may consider "possible effect of inflation" when choosing investments). As an additional matter, the distinction between income and growth is either less relevant or irrelevant in light of Weigt's decision to purchase

15

deferred variable annuities. As described above in part I.A., the annuities do not make distributions equal to the dividends produced by the underlying investments; rather, the annuities produce cash flow if and when the trustee elects to withdraw money from the annuities. And as described below in part I.C., the trustee adopted a method of calculating income from the annuities that does not correspond with the dividends produced by the underlying investments; rather, the trustee determined the amounts of distributions to Berget based on quarterly increases in the value of the annuities' underlying investments. In that context, a growth-oriented strategy might or might not result in greater distributions to Berget than an income-oriented strategy, depending on fluctuations in value.

The second part of Berget's contention also is flawed because the prudence of a trustee's investment decisions may not be determined based on hindsight. *In re Irrevocable Inter Vivos Trust Established by R.R. Kemske by Trust Agreement Dated October 24, 1969*, 305 N.W.2d 755, 761 (Minn. 1981). In *Kemske*, the supreme court held that the trustee did not commit a breach simply because treasury bills would have performed better than the trustee's choice of stock mutual funds. *Id.* at 760. "Trustees acting honestly, with ordinary prudence and within the limits of their trust, are not liable for mere errors of judgment; a trustee should not be held liable for unfortunate results which he could not be expected to foresee and was powerless to prevent." *Fortune v. First Trust Co. of St. Paul*, 200 Minn. 367, 379, 274 N.W. 524, 530 (1937) (internal quotations and citations omitted). In 2007, both Bjorklund and Weigt anticipated that the investments within the annuities would grow over the long term. The district court found

16

that Weigt reasonably relied on Bjorklund's advice. The actual performance of the trust's investments since 2007, and the actual performance of the stock market as a whole during that time period, is not a significant part of the inquiry. *See Kemske*, 305 N.W.2d at 761.

Thus, the district court did not err in its conclusion that Weigt did not breach her fiduciary duty by selecting primarily growth-oriented stocks as the underlying investments of the annuities.

## C.    Determination of Amount of Income

Berget contends that Weigt breached her fiduciary duty to pay him 70% of the quarterly net income of the trust.

The district court found that Weigt determined the method of calculating distributions by relying on the advice of Bjorklund, Brucker, and Berget's attorney, which was not contradicted by the advice of another attorney, Sayers. The district court also found that the trust instrument provided Weigt with broad discretion to determine allocations based on the growth in the value of the annuities. The district court concluded that Weigt acted reasonably by relying upon the advice of Brucker and Bjorklund.

On appeal, Berget contends that Weigt violated the terms of the trust instrument by calculating distributions based on the quarterly growth in the value of the annuity contracts rather than on the amount of dividends or interest produced by the underlying investments. As a result, Berget contends, Weigt has distributed too much money to him and diminished trust principal.[3]

---

[3]Berget's contention raises a question as to whether he has sustained any damages arising from Weigt's alleged breach. Typically an income beneficiary complains that a

17

If a trustee's exercise of power is discretionary, we generally will interfere only to prevent an abuse of discretion. *Stisser*, 818 N.W.2d at 509. For purposes of a trust, the term "income" is defined by statute to mean "the return in money or property derived from the use of principal." Minn. Stat. § 501B.61, subd. 1 (2012). The term is not defined in grantor's trust instrument. We ordinarily would interpret the relevant provisions of the trust instrument in a manner that is consistent with the trust statute and the caselaw. *See Stisser*, 818 N.W.2d at 502; *Van Dusen*, 834 N.W.2d at 526. In this case, however, the matter may be analyzed differently because the trustee purchased variable deferred annuities as the primary investment vehicles for the trust's assets. As explained above in part I.B., the annuities do not produce income in the customary manner. Rather, the annuities retain income along with capital appreciation, provide a contractually guaranteed stream of payments at a future date, and allow early withdrawals before the start of the stream of payments.

The trust statute accounts for the nature of an annuity by permitting a trustee to allocate cash receipts from an annuity as either income or principal. If a trust owns property in the form of an annuity, "the receipts from the property must be allocated in accordance with what is reasonable and equitable in view of the interests of those entitled to income as well as of those entitled to principal." Minn. Stat. § 501B.69 (2012). Consistent with this statute, grantor's trust instrument authorizes the trustee to "allocate

---

trustee has paid too little income, not too much. *See, e.g.*, *Van Dusen*, 834 N.W.2d at 518. But Weigt has not argued that Berget has not sustained any damages arising from her method of determining income. Thus, for purposes of this opinion, we assume without deciding that Berget can establish that he was injured by the alleged breach.

18

any receipts or disbursements between principal and income." In a case with a similar provision in the trust instrument, the Washington Supreme Court held that a trustee properly exercised its discretion by allocating annuity payments to both income and principal based on the value of trust principal and an assumed reasonable rate of return. *See Templeton v. People's Nat'l Bank*, 722 P.2d 63, 66 (Wash. 1986).

The district court noted that Weigt sought the advice of counsel to determine how to make distributions to Berget. "The work of trusteeship, from interpreting the terms of the trust to decisionmaking in various aspects of administration, can raise questions of legal complexity. Taking the advice of legal counsel on such matters evidences prudence on the part of the trustee." Restatement (Third) of Trusts § 77 cmt. b(2); *see also Comstock*, 219 Minn. at 338, 17 N.W.2d at 664. In this case, Weigt's actions in seeking out legal advice tend to show that she acted prudently in trust administration. Furthermore, grantor's trust instrument grants the trustee discretion to "pay to the beneficiary . . . so much or all of the net income *and principal* of the trust as the Trustee deems necessary from time to time for the health, maintenance in reasonable comfort, and education" of Berget. (Emphasis added.) Moreover, Berget and his attorney were informed of the trustee's considerations and urged Weigt to continue making quarterly payments.

Thus, the district court did not err in its conclusion that Weigt did not breach her fiduciary duty by the manner in which she determined the distributions to be paid to Berget. In reaching this conclusion, we do not intend to limit the trustee's discretion to adopt a different method of calculating income for future purposes.

19

**D.     Decisions Regarding Investments in 2010**

Berget contends that Weigt breached her fiduciary duty because she did not re-evaluate the underlying investments of the annuities in 2010, after a prolonged period of poor performance.

The district court did not find that Weigt breached her fiduciary duties in the manner alleged, even though it "would have been reasonable and prudent for Trustee to seek out independent advice from another financial advisor by 2010." The district court concluded that, even if there was such a breach, Berget did not prove that seeking independent advice "would have reduce[d] the losses sustained by the Trust or increased the income distribution to" Berget.

On appeal, Berget contends that the district court erred by not finding a breach and by not awarding damages. Berget's contention is based on the testimony of his expert witness, who testified that if Weigt had "properly invested" the trust assets, the value of the trust's principal would have increased. But the expert's analysis was based on the premise that the trustee made different investment decisions at the beginning of 2007. The expert did not testify about how the trust's investments would have performed if Weigt had sought advice from a different financial advisor in 2010. Berget did not even introduce any evidence that a consultation with a different financial advisor in 2010 would have led Weigt to pursue a different investment strategy.

Thus, the district court did not err by declining to find that Weigt breached her fiduciary duty by not seeking independent investment advice in 2010, and the district court did not abuse its discretion by not awarding damages on the alleged breach.

20

In sum, based on the particular facts of this case, the district court did not err in its findings of fact or its conclusions of law concerning Berget's claims that Weigt breached her fiduciary duties.

## II. Attorney Fees and Costs

After the district court's order for judgment, Weigt moved for an award of attorney fees and costs, to be paid from the trust. Weigt sought attorney fees of $170,869.30 and costs of $20,483.06. The district court granted the motion in part and denied it in part. The district court awarded attorney fees of $115,005.00 and costs of $12,332.87. Both parties appeal from the district court's ruling.

### A. Attorney Fees

An award of attorney fees in a trust dispute is not a matter of right and depends in part on the "reasonableness of the party's arguments." *Van Dusen*, 834 N.W.2d at 526-27 (citing *In re Atwood's Trust*, 227 Minn. 495, 501, 35 N.W.2d 736, 740 (1949)). A district court should "consider the underlying allegations against a trustee when deciding whether to allow the trustee's attorney fees to be paid out of the corpus of the trust." *In re Trusteeship of Williams*, 591 N.W.2d 743, 749 (Minn. App. 1999). We apply an abuse-of-discretion standard of review to a district court's ruling on a trustee's request for attorney fees. *In re Trust Created by Hill*, 499 N.W.2d 475, 493 (Minn. App. 1993), *review denied* (Minn. July 15, 1993).

#### 1. Entitlement to Fees

Berget argues that the district court erred by awarding any attorney fees to Weigt. He contends that Weigt should not be awarded attorney fees because she breached her

fiduciary duties. Because we have affirmed the district court's decision on the merits in favor of Weigt, we must reject this contention. Berget does not make an alternative contention that Weigt is not entitled to attorney fees even if she prevails on appeal. Thus, the district court did not err by concluding that Weigt is entitled to an award of attorney fees.

### 2. Amount of Fees

Weigt argues that the district court erred by not granting all the attorney fees she sought in her motion. The district court denied Weigt's request in part for two reasons. First, the district court reduced the hourly rates of Weigt's attorneys and paralegals to reflect hourly rates that are customary in the community for the type of services provided and the difficulty of the issues raised. Second, the district court declined to award attorney fees for services performed before November 26, 2012, based on the district court's findings that Weigt failed to seek independent investment advice in 2010 and that she delayed filing an objection to Berget's petition in late 2012. Weigt challenges the district court's ruling with respect to both of these reasons for limiting the award of fees.

### a. Hourly Rate

Weigt argues that the district court erred by reducing the hourly rates of her attorneys and paralegals.

A district court may award attorney fees to a trustee for expenses "reasonably and necessarily incurred" in the defense or administration of a trust. *In re Great N. Iron Ore Props.*, 311 N.W.2d 488, 493 (Minn. 1981). In determining a reasonable hourly rate, a district court may consider the "prevailing market rates in the relevant community."

22

*Shepard v. City of St. Paul*, 380 N.W.2d 140, 143 (Minn. App. 1985) (citing *Blum v. Stenson*, 465 U.S. 886, 895, 104 S. Ct. 1541, 1547 (1984)). In the federal courts, the "relevant community" generally is the "district where the case is tried." *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140-41 (8th Cir. 1982) (quotations omitted); *see also Donnell v. United States*, 682 F.2d 240, 251 (D.C. Cir. 1982) (explaining that relevant community is "the one in which the district court sits"). But a district court might apply hourly fees higher than those that prevail in the community if out-of-town counsel are necessary to perform services that local attorneys are unable or unwilling to perform. *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982).

This case was venued in Washington County. Weigt was represented by attorneys at the law firm of Dorsey & Whitney, LLP, which has its main office in Hennepin County, in Minneapolis, approximately 26 miles from the Washington County courthouse, and has offices in 12 other cities in 3 countries. The district court is permitted to rely on the common knowledge that Dorsey & Whitney provides legal services in national and international markets as well as in Minnesota and that its hourly rates are likely to correspond more closely with hourly rates that prevail in metropolitan areas outside Washington County. Weigt does not contend that this case involved a highly-specialized area of law or unusually difficult issues or that Washington County attorneys were unable or unwilling to handle the case. In fact, the parties raised issues of trust law that tend to arise from time to time throughout the state. Thus, we conclude that the district court did not abuse its discretion by reducing the hourly rates of Weigt's

23

counsel and their staff to account for the type of legal services provided and the prevailing hourly rates in Washington County.

### b.   *Reduction in Hours*

Weigt argues that the district court erred by reducing the number of hours for which fees could be awarded.

A district court has discretion in determining the services for which fees should be awarded to a trustee.  *Atwood*, 227 Minn. at 501, 35 N.W.2d at 740.  But a district court must decline to award fees for "services that were inessential to the benefit conferred upon the trust."  *Great N. Iron Ore Props.*, 311 N.W.2d at 493.  The district court may not award attorney fees if it "would permit invasion of the trust corpus for a wholly unwarranted purpose, where the litigation has conferred no benefit on the trust."  *In re Campbell's Trusts*, 258 N.W.2d 856, 868 (Minn. 1977).  A district court must consider "the character, ability, and experience of the attorneys, the amount involved, the time necessary to prepare for trial, the responsibility assumed in connection therewith by counsel, the difficulties of the propositions involved, the results obtained, and the amount customarily charged for service of like character."  *Atwood*, 227 Minn. at 502, 35 N.W.2d at 741.

In this case, the district court reasoned, in essence, that Weigt could have prevented litigation if she had sought independent investment advice in 2010.  This is an appropriate consideration.  It also is appropriate for the district court to consider the manner in which a party conducts itself in the course of litigation. *See id.*  Our deference to the district court is at its greatest when we are reviewing a ruling that is based on

events occurring in the district court itself, which provides the district court with a better vantage point from which to evaluate the appropriateness of the fees incurred. *See Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 776 N.W.2d 172, 180 (Minn. App. 2009), *aff'd*, 790 N.W.2d 167 (Minn. 2010). Thus, we conclude that the district court did not err by reducing the number of hours for which fees may be awarded.

**B.    Costs**

Weigt argues that the district court erred by not granting all of the costs she sought in her motion. Specifically, Weigt contends that the district court erred by denying her request for reimbursement of four categories of costs: "copy/print and binding charges," "bates labeling," "computerized legal research," and "postage, fax & supplies."

"In every action in district court, the prevailing party . . . *shall* be allowed reasonable disbursements paid or incurred." Minn. Stat. § 549.04, subd. 1 (2012) (emphasis added). "The standard by which the court's discretion is measured is whether expenditures are *reasonable*. Therefore, absent a specific finding that the costs were unreasonable, the court *shall* approve recovery of disbursements." *Jonsson v. Ames Constr., Inc.*, 409 N.W.2d 560, 563 (Minn. App. 1987), *review denied* (Minn. Sept. 30, 1987).

In this case, the district court denied Weigt's request for reimbursement of the four categories of costs described above on the ground that an award would result in a "double recovery." The district court reasoned, "These items and amounts are disallowed as they are typically included in an attorney's billable hour and are normal business overhead paid by the law firm, not a client." We are not aware of any caselaw to support the

25

district court's reasoning with respect to three of the four categories ("copy/print and binding charges," "bates labeling," and "postage, fax & supplies"). In fact, the caselaw appears to suggest otherwise. *See, e.g.*, *Striebel v. Minn. State High Sch. League*, 321 N.W.2d 400, 403 (Minn. 1982) (affirming reimbursement of costs of photocopies); *Kellar v. Von Holtum*, 583 N.W.2d 761, 765-66 (Minn. App. 1998) *rev'd on other grounds*, 605 N.W.2d 696 (Minn. 2000), *as modified on reh'g* (Feb. 29, 2000) (same). Furthermore, our experience is that attorneys in private practice typically bill these types of expenses to clients. Weigt submitted copies of invoices she received from Dorsey & Whitney that itemize these expenses, and Weigt's attorney stated in an affidavit that the "amount sought represents the actual cost to Dorsey for the disbursement sought" and that the amounts paid actually were billed to Weigt. Berget does not contend that any of these expenses are unreasonable. Thus, we conclude that Weigt is entitled to reimbursement for three of the four categories of expenses that the district court denied.

As for the expenses of online legal research, the district court's reasoning is not inconsistent with any opinion of the supreme court or any precedential opinion of this court. Weigt urges this court to follow certain opinions of some federal courts that have allowed reimbursement of such expenses. But those cases are not binding on either the district court or this court. *See Jendro v. Honeywell, Inc.*, 392 N.W.2d 688, 691 n.1 (Minn. App. 1986), *review denied* (Minn. Nov. 19, 1986). Furthermore, the cases cited by Weigt are contrary to the view that prevails in our own federal circuit, the United States Court of Appeals for the Eighth Circuit. *See Standley v. Chilowee R-IV Sch. Dist.*, 5 F.3d 319, 325 (8th Cir. 1993); *Leftwich v. Harris-Stowe State Coll.*, 702 F.2d 686, 695

26

(8th Cir. 1983). We are not aware of any precedential Minnesota caselaw that guides the district court on this specific point. Thus, the district court did not abuse its discretion by denying Weigt's request for reimbursement of expenses she incurred for online legal research.

Therefore, we modify the district court's decision on Weigt's motion for costs by adding $4,130.53 ($3,627.07 for "copy/print and binding charges," $286.32 for "bates labeling," and $217.14 for "postage, fax & supplies") to the district court's award of $12,332.87, resulting in a total costs award in the amount of $16,463.40. In all other respects, we affirm the district court's decision on Weigt's motion for attorney fees and costs.

**Affirmed as modified.**